## THE STATE OF CONNECTICUT *vs.* THE PHŒNIX BANK.

Under the provisions of the charter of the Phœnix Bank, and the laws of the state, subscribers to its non-transferable stock became stockholders and members of the corporation, and could not be directly or indirectly excluded.

The affairs of the corporation were committed to the management of the absolute stockholders. Under the provisions of the act of Congress to provide a national currency, and in the absence of regulating or controlling state legislation, it would have been competent for two-thirds of the absolute stockholders to re-organize the corporation as a national bank, include the qualified stockholders, and transfer to the new institution the entire stock and assets of the old. Such re-organization and transfer would have carried the non-transferable stockholders into the new organization, and they could not have been excluded. If aggrieved thereby their only remedy would have been a withdrawal.

But by the act of 1863 the bank was authorized to surrender, and did surrender its charter before re-organization. The effect of such surrender was to

absolve the absolute stockholders from all obligation to continue the business for the benefit of the qualified stockholders, and leave the former at liberty to re-organize without the latter, like any other number or class of individuals; and having thus re-organized without including the qualified stockholders, the latter were no longer entitled to representation.

The act of 1864 was not binding upon the bank in respect to its relation to its qualified stockholders until accepted by them.

Upon the surrender of the charter the qualified stockholders became entitled to a full share of the assets of the bank, or of the avails of the sale thereof, and their rights would be enforced by a court of equity, upon their application, by decree and execution.

BILL IN EQUITY, brought to the superior court in Hartford county. The principal allegations of the bill were as follows :—

That the President, Directors and Company of the Phœnix Bank were, and for more than fifty years had been, a banking corporation, duly incorporated by the legislature of the state, and located and having its place of business in the city of Hartford; that the capital stock of the bank consisted of 12,088 shares, of the par value of $100 each; that the. state of Connecticut had from time to time, since the incorporation of the bank, subscribed to its stock, and was now, and at the time of the grievances complained of, the owner of 1270 shares of the stock; that by the charter the directors of the bank had the disposal and management of its moneys, credits, and property, with power to regulate its concerns; that the bank had been engaged for more than half a century in a large and profitable business, under a charter conferring valuable powers and franchises, and that the reputation of the bank and good will of the business were of great value to it; that the bank was, at the time of the grievances complained of, and continued to be the owner of a large property, consisting of real estate, government securities, gold and silver coin, and other property, of the value of three millions of dollars. That the directors of the bank, with certain other stockholders of the bank, and who composed a majority of more than two-thirds of all the stockholders, combining with the bank and with each other to injure the petitioner as a stockholder, and to deprive the petitioner of said stock, on the 17th

day of December, 1864, without notice to the petitioner, and without the petitioner's knowledge, formed a banking association under an act of the United States, entitled "an act to provide a national currency by a pledge of United States bonds, and to provide for the circulation and redemption thereof," and have assumed for such association the name of the Phœnix National Bank of Hartford ; that all the directors of the Phœnix Bank except Thomas Steele, had suffered themselves to be and to become directors of the national banking association, and had assumed and were now discharging the duties of directors therein ; and that the Phœnix Bank, the new association, and the directors, made respondents in the suit, with said stockholders, pretended that the Phœnix Bank had been converted under the laws of the United States, and in accordance with the laws of the state of Connecticut, into the national banking association known as the Phœnix National Bank, and that the Phœnix Bank had become merged in the Phœnix National Bank, and that the last named corporation was the successor in law and in fact of the Phœnix Bank, and entitled to its business, good will, and rights of property. That, immediately on learning that said national banking association had been formed, and that the respondents pretended that the Phœnix Bank had been converted into such national banking association, to wit, on the 7th day of January, 1865, the petitioner, through Gabriel W. Coite, then treasurer of the state, advised the respondents that the petitioner had elected and was desirous, if said Phœnix Bank had in fact been converted or was to be converted into such national banking association, to become a stockholder in such association, and to have the stock held by the petitioner in the Phœnix Bank counted and made part of the capital stock of the national association ; that nevertheless the respondents, intending unjustly to deprive the petitioner of said stock, wholly excluded the petitioner from the organization of said national banking association, and from all right, interest and membership therein, and had ever since refused to allow the petitioner to become a stockholder therein ; that the Phœnix Bank had not, at least as against

the petitioner, been converted into a national banking associa-
tion, and that the Phœnix National Bank was not in any sense
the successor of the Phœnix Bank, or entitled to its business,
good will, and rights of property; yet that the Phœnix Na-
tional Bank, through its directors, well knowing the premises,
and intending unjustly to deprive the petitioner of said stock,
had taken possession of all the real and personal estate of the
Phœnix Bank, and was now trading and banking with its
moneys and assets for the exclusive benefit of the Phœnix
National Bank, and the Phœnix Bank was about to execute
and deliver formal conveyances of all its estate and rights of
property to the Phœnix National Bank for its exclusive use
and benefit, and was about to surrender its charter and to
wind up its business to make way for the Phœnix National
Bank. That after the pretended conversion of the Phœnix
Bank into a national banking association, and the exclusion
of the petitioner therefrom, to wit, on the second day of Jan-
uary, 1865, the petitioner requested both of the Phœnix
Bank and of the Phœnix National Bank the par value of the
petitioner's stock in money, and a ratable and proportional
share of the surplus on hand earned by the bank during the
time the petitioner had held the same, but that both then re-
fused and had ever since refused to pay to the petitioner such
par value and share of surplus earnings. That afterwards,
on the same day, the petitioner requested both the Phœnix
Bank and the Phœnix National Bank to ascertain the apprais-
ed value of said stock in the mode in such cases provided by
law, to the end that such ascertained value might become a
debt due from the Phœnix National Bank to the petitioner,
but both the Phœnix Bank and the Phœnix National Bank
then refused and ever since had refused to ascertain such ap-
praised value, and wholly denied the rights of the petitioner
in the premises. That all the acts complained of had been
and were against the mind and will of the petitioner, in fraud
of the just rights of the petitioner, and in violation of equity
and good conscience, and that the petitioner was without ade-
quate remedy at law. And praying the court to inquire into
the allegations of the petition, and on finding them true to

order, by a decree of perpetual injunction, that the Phœnix National Bank and its directors desist from using the moneys, assets, and property received from the Phœnix Bank, and that the Phœnix Bank and its directors be enjoined from delivering and conveying its estate or any part thereof to the Phœnix National Bank, and from surrendering its charter or winding up its affairs ; or if the court should be of opinion that the petitioner was not entitled to the relief prayed for, that it would order the Phœnix Bank and the Phœnix National Bank to admit the petitioner as a stockholder in the latter bank, and to cause the petitioner's stock in the former bank to be counted as a part of the capital stock of the latter bank, and would order the Phœnix National Bank to pay the petitioner, on said stock, a sum equal to the dividends which the stock would have drawn if it had been represented in said national bank, with interest ; or that the court would order an account to be taken of the par value of the petitioner's stock in the Phœnix Bank, and the ratable and proportional share to which the petitioner was entitled of the surplus earnings of the bank, and decree that the same should be paid to the petitioner, with interest ; or that the court would in some other and more appropriate way grant relief. The petition was dated the 2d day of February, 1865.

The respondents filed an answer, the facts set up in which are sufficiently stated in the finding of facts by the committee. The case was referred to a committee by whom the following facts were found :—

The Phœnix Bank was incorporated by the legislature of this state in the year. 1814, by the name of the President, Directors and Company of the Phœnix Bank, and was immediately after organized under its charter, and carried on the ordinary business of a bank, at the city of Hartford, from that time until the 31st day of December, 1864. At this time the capital stock of the bank consisted of 12,088 shares of $100 each, including 1,914 shares of non-transferable stock. The charter contained the following provisions with regard to the stock of the bank.

"Sec. 3. The capital stock of said bank shall consist of ten thousand shares, each share being one hundred dollars."

"Sec. 5. In addition to the subscription hereinbefore authorized, the state of Connecticut shall have a right at any time to subscribe to said bank at the rate of one hundred dollars for each share; and whenever the state shall have subscribed five hundred shares, and paid for the same, it shall have a right of appointing two additional directors of said bank."

"Sec. 6. In further addition to the subscriptions hereinbefore authorized, the said bank shall at all times be opened for subscriptions at the rate of one hundred dollars for each share, from the school fund of the state, or from the funds of any college, ecclesiastical society, school, or corporation for charitable purposes within this state; provided nevertheless that shares so subscribed shall not be transferable, but may at any time be withdrawn on six months notice to the directors, and that the shares so subscribed and those subscribed by the state shall never exceed the shares subscribed by individuals."

The bank paid the state a bonus of $50,000 for its charter. The state from time to time subscribed for shares of the stock described as non-transferable, in all to the amount of 1,220 shares, and paid in $122,000 therefor. These subscriptions and payments were made in the years 1821, 1822, 1823, 1824, 1832 and 1846, and the stock thus taken by the state was held by it on the 31st of December, 1864.

By the charter of the bank the directors have the manage ment of its property with power to regulate its concerns. It has been engaged for more than half a century in a large and profitable business, under a charter conferring valuable powers and franchises, and the reputation of the bank and good will of its business are of great value to the bank. It has also a large property, and a large surplus above its nominal capital.

In the fall of 1864 the financial policy of the Federal Government in relation to state banks became such, that, in the opinion of the directors of the bank, they could not profitably continue to do business under their state charter. On the

21st of November 1864 the directors called a meeting of the stockholders, for the purpose of determining whether the bank should become a national banking association under the laws of the United States. At that meeting, which was legally called for the purpose, and holden on the 15th day of December, 1864, the following resolutions were passed. The vote upon the first one was taken by an entry in a book by each stockholder who desired to vote, of his name with the word "yes" or "no" written against it, each voting upon his shares of stock according to their amount. There were thus entered in the book 7,982 votes, of which 7,944 were in favor of the resolution and 38 against it, and more than two-thirds of all the stockholders of the bank having thus voted in favor of the resolution it was declared to be passed. The resolutions were as follows :—

" *Voted,* that the President, Directors and Company of the Phœnix Bank will and do now hereby become a national banking association, for carrying on the business of banking, under the laws of the United States, according to the provisions of an act of Congress approved June 3d, 1864, entitled 'An Act to provide a national currency secured by a pledge of United States bonds, and provide for the circulation and redemption thereof,' and in case of the adoption of this vote by the requisite and legal two-thirds vote, then, in order that said bank may become such association, the directors of this bank, or a majority of them, be and they are hereby authorized, empowered and directed, for and on behalf of this Bank, to change and convert said bank into a national banking association, and to make, adopt and execute any and all such articles and certificates of association and organization certificate, as are required to be made or are contemplated by said act ; and also to make and execute all other papers and certificates and to elect to do and do all acts necessary or deemed necessary to be elected to be done or done, either by the laws of the United States or of this state in the premises, and necessary to convert said bank into a national banking association, under the name of the Phœnix National Bank, to

be located in the city of Hartford, Connecticut, and to perfect the organization thereof.

"*Voted*, that the capital stock of the Phœnix National Bank shall be fixed and limited by the directors of the Phœnix Bank at such sum as they shall deem expedient, not exceeding the sum of $1,017,400, with the privilege of increasing the same from time to time, subject to the limitations of said act, to any sum not exceeding $3,000,000; and their .articles of association shall provide for the continuance of said association for the term of twenty years from and after the date of the organization certificate, unless sooner dissolved by the act of two-thirds of the stockholders thereof, and that said directors be and they are hereby empowered and authorized to make all transfers, contracts and agreements, and to do whatever acts are necessary to transfer the assets of every description and character of said Phœnix Bank to the national banking association into which it is to be converted, so that said conversion may be absolute and complete, and to make and adopt any and all by-laws which they may deem expedient for the management of the affairs of said association.

"*Voted*, that the president of the Phœnix Bank be and he is fully authorized and empowered, on behalf of said bank, to make, execute, acknowledge and deliver all such deeds and other instruments of conveyance as may be advisable or convenient, in order to convey to and vest in the association authorized to be formed as the Phœnix National Bank, all the property of said Phœnix Bank, real, personal and mixed, whenever the directors of said last named bank, or a majority of them, shall advise and direct the same to be done."

The meeting also adopted articles of association for the new organization, by one of which the name of the Phœnix National Bank of Hartford was assumed in the place of the former name. The 4th article was as follows:—

"The capital stock of this association shall be $1,017,400, to be divided into shares of one hundred dollars each; but the capital may be increased, according to the provisions of the thirteenth section of said act, to any sum not exceeding

three millions of dollars ; and in case of the increase of the capital of the association, each stockholder shall have the privilege of subscribing for such number of shares of the proposed increase of the capital stock as he may be entitled to according to the number of shares owned by him before the stock is increased."

The meeting also passed the following vote :—

*Voted*, That the persons chosen at the last annual meeting of the stockholders of the Phœnix Bank directors of said bank, and the two persons now in office as state directors, who shall be and become duly qualified, be and they are hereby chosen and made directors of the Phœnix National Bank, to hold their offices until the first annual meeting of said national bank, to be holden on the second Tuesday of January, 1865, and until their successors are chosen and qualified.

Immediately after the adjournment of the meeting a meeting of the directors was holden, at which the following votes among others were passed :—

*Voted*, That this bank elects not to accept the provisions of the law of this state, passed in 1864, in relation to banks becoming national banking associations, and to surrender the charter of the Phœnix Bank, except so far as the same is continued in force by the law of this state, passed in 1863, in relation to said subject.

*Voted*, That the inspectors of elections, appointed by the stockholders, be and they are hereby instructed to prepare and keep open during banking hours at the banking house in Hartford, until the close of business on the second Tuesday of January, 1865, a book wherein any stockholder who did not vote at the special meeting, may by himself or his attorney enter and register his assent or dissent to the vote changing this bank into a national banking association, and his authority to the directors to do all the acts specified in said resolution, with the number of shares held by such stockholder."

In compliance with this vote a book was opened by the directors, and between Dec. 15th, 1864, and the 2d Tuesday

of January, 1865, 936 additional votes were cast assenting to and ratifying the acts of the stockholders and directors, and all of the stockholders of the Phœnix Bank who held transferable certificates of stock have either assented to, or have not dissented from, the acts of the stockholders and directors of the bank, in converting it into a national banking association, and in the surrendry of its charter. Notice of the meeting was given in two daily and weekly newspapers published in Hartford, by advertisements published from November 21st, to December 15th, 1864, and the proposed change was referred to editorially in these papers. No attempt was made to conceal the change from the petitioner. Parties holding non-transferable certificates were not personally notified of the meeting. Prior to and on December 15th, 1864, James G. Batterson and Edward H. Fenn were the state directors of the Phœnix Bank and were acting as such. Both of them, under the impression that the state had no right to go into the new organization as a stockholder, and with the understanding that whatever rights the state had in the premises would not be affected by the change, advised and favored the change to a national organization, and were present at the meeting of the directors held on the 15th of December, 1864.

The directors unanimously adopted articles of association, and elected to surrender their charter. A majority of them also signed the articles of association, the organization certificate, and the other certificates required by the act of Congress and the instructions of the comptroller of the currency, took the oath required by the act, and forwarded all the papers to the proper department at Washington. The comptroller of the currency gave them a certificate under his hand, that the provisions of the act of Congress had been complied with, and that the new association was authorized to commence the business of banking. The certificate was dated December 31st, 1864, and on the 2d day of January, 1865, the old bank ceased to do business, and the new bank took its place and its business, and possession of all its assets, real and personal, and has ever since continued the business of bank-

ing, and has paid and discharged, whenever presented for payment, the liabilities of the Phœnix Bank.

The capital stock which was fixed in the articles of association at the sum of $1,017,400, was the amount of the capital of the Phœnix Bank represented by transferable certificates, and was divided into the number of shares owned by the stockholders of the bank having transferable certificates, and the organization certificate gave the names of all such stockholders, with the number of shares by each owned at the time of the conversion. Seven eighths of the stockholders in the old bank have surrendered their certificates and taken certificates in the new organization, and dividends have been regularly declared upon the whole stock, and paid as called for.

The new association, immediately after its organization, on the 22d day of December, 1864, notified the state treasurer that the charter of the Phœnix Bank had been surrendered, that the bank had ceased to do business as a state bank, and had been converted into a national banking association, and that the association held the principal sum of $122,000, with interest from the date of the last dividend theretofore declared by the bank, subject to the order of the state, and offered to pay the same to the state. Upon receiving this notice the treasurer immediately took measures to ascertain the rights of the state in the matter, and within a reasonable time, on the 7th day of January, 1865, sent the following letter to the officers of the Phœnix Bank :

> STATE OF CONNECTICUT, }
> TREASURER'S OFFICE, }
> Hartford, January 7th, 1865. }

*To the President, Directors and Company of the Phœnix Bank:*—You are hereby notified that the State of Connecticut has elected, and does hereby elect, to continue to hold the shares of stock of your bank, now owned by and standing in the name of the State of Connecticut, as stock of the national banking association, which you have formed under the name of the Phœnix National Bank of Hartford. The State will expect all its stock to be represented in the new organ-

ization, and that such stock will become transferable, not differing in any of its rights from the other stock of such bank. I request to be informed whether you have or have not included the stock owned by the State, in the stock of the Phœnix National Bank of Hartford.    GABRIEL W. COITE,

*Treasurer of the State of Connecticut.*

The respondents refused, and still refuse, to permit the stock of the state to be represented in the new organization, and that such stock should become transferable. Previous to the writing of the above letter the state treasurer had demanded both of the Phœnix Bank and of the Phœnix National Bank, the par value of the petitioner's stock in money, and a proportional share of the surplus on hand, earned by the bank during the time the petitioner had held the stock, but both refused and still refuse to pay to the petitioner any share of the surplus earnings, but have been and are willing to pay the amount of money subscribed by the state, to wit, $122,-000, and the interest thereon since the date of the dividend in September, 1864.

Early in the year 1862 the state treasurer, by the advice of the other state officers, as he claimed, gave notice to the Phœnix Bank of his intention to withdraw the stock owned by the state, but before the amount became payable according to law and the terms of the notice, the notice was withdrawn by the advice of the finance committee of the legislature then in session.

Upon these facts the case was reserved for the advice of this court.*

---

* Such portions of the act of Congress approved June 3d, 1864, and of the several acts of the General Assembly of this state, as bear upon the present case, or upon that of *The State* v. *The Hartford National Bank,* next following, are here given.

The act of Congress entitled "An Act to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof," provides as follows:—

"SEC. 44. That any bank incorporated by special law, or any banking institution organized under a general law of any state, may, by authority of this act, become a national association under its provisions, by the name prescribed in its organization certificate; and in such case the articles of association and the organiza-

*C. Chapman* and *Hubbard*, with whom was *McFarland*, for the state.

1. What is the character of the stock held by the state in the Phœnix Bank? Is it an absolute or qualified stock?

(1.) Section 5th of the charter, under which the stock was issued, imposes no disability, condition or qualification. So far therefore as this section is concerned the stock created under it is like any other stock of the corporation. (2.) Then does the proviso of the 6th section apply to the stock issued

tion certificate required by this act may be executed by a majority of the directors of the bank or banking institution; and said certificate shall declare that the owners of two-thirds of the capital stock have authorized the directors to make such certificate and to change and convert the said bank or banking institution into a national association under this act. And a majority of the directors, after executing said articles of association and organization certificate, shall have power to execute all other papers, and to do whatever may be required to make its organization perfect and complete as a national association. The shares of any such bank may continue to be for the same amount each as they were before said conversion, and the directors aforesaid may be the directors of the association until others are elected or appointed in accordance with the provisions of this act; and any state bank which is a stockholder in any other bank by authority of state laws, may continue to hold its stock, although either bank or both may be organized under and have accepted the provisions of this act."

The act of 1863, passed by the legislature of this state, contains the following provisions:—

"Sec. 1. When two-thirds of the stockholders of any bank incorporated by authority of this state shall vote at a meeting called by the board of directors to become an association for carrying on the business of banking under the laws of the United States, said bank shall be deemed to have surrendered its charter; provided that every such bank shall, nevertheless, be continued a body corporate for the term of three years after the time of such surrender, for the purpose of prosecuting and defending suits by or against it and closing its concerns; but not for the purpose of continuing, under the laws of this state, the business for which it was established.

Sec. 2. Any stockholder in a bank which shall elect as hereinbefore provided to become a banking association under the laws of the United States, who may not consent to become a stockholder in such banking association, shall be entitled to receive from such bank the fully appraised value, ascertained in such mode as the board of directors may prescribe, of the stock so held by him; and the appraised value of said stock shall be deemed to be a debt due such stockholder from such banking association until paid."

The act of 1864, passed by the legislature of this state, contains the following provisions:—

Sec. 1. Any bank of this state which has become or may hereafter become a national banking association shall be deemed to have done so upon the faith of

under the 5th section ?　We say not.　It would have been so expressed, if it had been so intended.　It is not so expressed or even intimated.　Again, the language of the proviso excludes the possibility of such an application.　"That the stock so subscribed, *with that subscribed by the state*, shall never exceed the shares subscribed by individuals."　(3).　If the stock by the terms of the charter is absolute stock, has it become otherwise by the treatment it has received from the parties ?　If the stock has been treated by the state treasurer

the promise and assurance of this state, hereby pledged, that the rights and guaranties hereby offered to and conferred upon said banks, in the several provisions of this act, shall not be revoked or impaired.

"SEC. 2.　The charter of any such bank shall not be deemed surrendered, revoked, altered or amended, by the action of such bank in becoming a national banking association, nor by the operation of this act; but by such action of such bank and from the time of such action, said charter shall be deemed suspended, (except so far as the same shall remain in force by virtue of section sixth of this act,) and shall continue so suspended until such bank shall cease to be a national banking association."

"SEC. 8.　In all cases where this state or any charitable institution, association or corporation, now holds stock not transferable in any bank now or heretofore doing business under the laws of this state, if such bank has determined, or shall determine, to become a national banking association, such bank shall give written notice of such determination to the treasurer of the state, or to such institution, association or corporation, as the case may be, which notice, in the case of any such bank already organized under the laws of the United States, shall be given within twenty days after the passage of this act, and, in the case of any such bank which may hereafter so organize, shall be given within ten days after such bank shall have made its said determination ; and thereupon the state, by its treasurer, or the other owners of such stock, as the case may be, may, within thirty days after the receipt of said written notice, elect, by giving written notice to such bank, to continue to hold such stock as transferable stock, not differing in any of its rights, liabilities or properties from the other stock of such bank, and to hold the same after the proposed change shall have been effected as stock of the proposed national banking association ; and thereupon such bank shall count such stock as part of its regular capital stock, and such stock shall be deemed for all purposes, thenceforth, regular capital stock of said bank.　If said owner or owners of such non-transferable stock shall not, within said thirty days, by giving said written notice to such bank, so elect to hold said stock as transferable stock, and to become a stockholder or stockholders in said proposed national banking association as aforesaid, then, at the expiration of said thirty days, said owner or owners shall be entitled forthwith to receive, and shall forthwith receive, from said bank, the par value of said stock, with interest thereon from and after the date of the last dividend which shall have been theretofore declared by said bank ; and said amount shall be a debt due and payable to said owner or owners from said national banking association, until paid, to be recovered in an action of debt, or any other proper action, instituted

State *v.* Phœnix Bank.

or the bank as non-transferable or qualified stock, it has been so treated obviously from a misapprehension of law and fact. "A mistaken practical construction cannot destroy the rights of the parties." *United Society* v. *Eagle Bank*, 7 Conn., 470. (4). If now it be said that the stock, even if absolute under the charter, has become qualified stock under the act of 1803, we answer that that act is not applicable to the Phœnix Bank, but only to the institutions specifically named in the act. This act was first passed on application of the Hart-

in the superior court, or in any other court of competent jurisdiction. Any bank of this state which shall refuse to permit any of the provisions of this section to be carried into full effect, shall not be entitled to the benefit of any of the other provisions of this act."

The act of 1865, passed by the legislature of this state, contains the following provisions:—

"Sec. 1. Whenever any bank of this state, in pursuance of a vote passed, or authority in writing given, by the holders of two-thirds or more of its stock, has been or shall be converted into a national association for carrying on the business of banking under the provisions of any act of the Congress of the United States, every holder of stock in such bank who expressly assents to such conversion, or who does not signify to such bank, in writing, his dissent thereto, within thirty days after notice in writing given him thereof, shall by means of such conversion become a shareholder in said national association, to the amount of the stock by him so held in such bank; and said notice may be given by leaving the same with such stockholder, or at his usual place of abode, or by depositing the same properly addressed to such stockholder, and with the postage paid thereon, in the post office nearest the place where the said bank is located; provided, that no right already vested shall be affected by this act.

"Sec. 2. Any person holding stock in a bank so converted into a national association, who has not and shall not become a shareholder in said association in the manner specified in the preceding section, shall be entitled to receive from said bank the value of the stock so held by him therein; which value shall be ascertained and determined by an appraisal made in such manner as the board of directors may prescribe. And in case the value so fixed shall not be satisfactory to any stockholder, he may appeal to the bank commissioners, &c."

"Sec. 4. Any bank of this state that has been or may hereafter be converted into a national association, in accordance with the provisions of this act, or the act to which this is in addition, and at the time of such conversion held any of the funds of this state, whether transferable or not, and has refused or shall refuse to allow the state, or such society, to become stockholders in the said national association, shall pay to the state, or such society, their respective shares of so much of the surplus of said bank as was reserved or accumulated while such funds were held by such bank, the amount of such claim for surplus to be determined according to the provisions of the second section of this act.

"Sec. 5. This act shall not affect any suit now pending, or any case where the rights of the parties have deen determined by mutual agreement."

ford Bank, the New Haven Bank, and the Middletown Bank, and has relation to these corporations specifically and to these only. 1 Private Stat., 168. If the stock in question is to be considered as absolute stock there can be no doubt of the right of the state to be represented in the new corporation.

2. But suppose the stock to be a qualified stock, is it not entitled to be represented in the national association ?

What are the attributes or incidents which qualify the stock ? (1.) That it is not transferable. (2.) That it has no vote. (3.) That it is withdrawable by the holder on notice. But the courts have decided that these are immaterial incidents in the ownership ; that the shares are in every sense of the term a part of the capital stock of the bank, and that the owners of these shares constitute a part of the body politic or corporation. *United Society* v. *Eagle Bank,* 7 Conn., 456. In this state of the case the acts of Congress and of the legislature of 1863 were passed. These acts are to be construed in view of the decisions above referred to. Now when the act of Congress provides that "the owners of two-thirds of the *capital stock*" may authorize the conversion of a state into a national bank, and "that the *shares* of any such bank may continue to be for the same amount as they were before said conversion," what is meant by the terms there employed ? What is the meaning of the phrase " *capital stock*," or that other term convertibly used, "*share ?*" We have an answer in the case above referred to. "In the first place I am of opinion that the plaintiffs (an ecclesiastical society) by the subscription became *shareholders.* What is intended by the word *share ?* In its popular and familiar meaning it denotes a portion of a thing owned in common. When therefore it was provided that the state and ecclesiastical societies might subscribe for *shares*, it was equivalent to the assertion *shares of the capital stock.*" Per Hosmer C. J., in *United Society* v. *Eagle Bank*, 7 Conn., 471. The act of Congress therefore, in terms which have been already judicially defined, has authorized the conversion of this kind of stock into national banking stock, and has empowered the holders of just such stock to "*authorize*" the directors to

effect such a conversion. It is no answer to say that this kind of stock cannot be voted on. No vote is required by the national law. It is sufficient that the holders of two-thirds of the stock shall have "*authorized*" the conversion. This may be done by a power in writing. And so it is assumed by the legislature of this state; for by the act of 1865 it is provided "that whenever any bank of this state, in pursuance of a vote passed, *or authority in writing given*, by the holders of two-thirds or more of its stock, has been or shall be converted," &c.

These results therefore follow of logical necessity. (1.) The holders of two-thirds of *all the stock* of the bank must authorize the conversion, otherwise no conversion can take place. (2.) The holders of non-transferable stock are equally with all other stockholders entitled to "authorize" the conversion or act on the question. But if the only mode of authorizing a conversion is by voting on the question, then we contend that the qualified stock is entitled to a vote. The act of Congress is the sole arbiter of the matter and can alone prescribe the qualifications of a voter, and it provides that there shall be a vote of "the owners of two-thirds of the capital stock." It is clear that the state owned a portion of the capital stock, and by the act the shares are to remain the same. If therefore the respondents were right in their claim that the state could not vote on its capital stock, it would prove that they were *never legally organized as a national bank*, for it is found that they did not have two-thirds of the capital stock exclusive of the state stock in favor of the change. It would also prove that if two-thirds of the stock of any bank happened to be non-transferable stock, the bank could not transform itself into a national bank.

If now it be said that the incidents which attend the ownership of this kind of stock under the state system are inconsistent with and repugnant to the law of the federal system, we admit it. What is the consequence? That the stock in question should become annihilated? Not at all, but that on conversion it should drop its repugnant attributes and become subject to the national law. So that in this view of the case

the stock which before conversion was withdrawable or non-transferable and without the right of voting, would after conversion become entitled to vote, be transferable and become non-withdrawable. This is only what happens to all kinds of stock. It must of necessity slough off all the qualities, incidents and peculiarities of the state creature, and become fashioned to and be governed by the requirement of the national law. For instance, by section 287 of the act relating to corporations, it is provided that no stock held in trust or owned by any banking corporation shall be entitled to vote at a meeting of the stockholders. Will it be pretended that such stock, in case of conversion, would not be entitled equally with the rest to be represented in the new organization ? Such a claim would be absurd.

The section of the act of 1864 which provides that the holders of non-transferable stock may at their election be represented in the national association, is applicable to this case, notwithstanding the finesse of the bank in electing not to organize under that act. Some of the sections of this act are applicable to all state banks becoming national banks, no matter whether the provisions of the act are accepted or not. Of this kind are sections 10th and 11th. To determine what sections are so applicable we must look to the nature of the sections. Why should not section 8th be applicable ? It purports in terms to apply to *"all cases."* And it is just and equitable that it should so apply.

The action of the state directors in assenting to the articles of association does not conclude the state. The question of conversion is one which belongs to the stockholders, not to the directors. The state was not represented at all at the stockholders' meeting. Again the state directors, do not represent and had no authority to represent the state in respect to a question of this sort. Their duties are simply to see to the administration and business of the bank. The state treasurer is the officer who represents and controls the stock. If the stock in question had been entitled to vote the treasurer was the only officer who could vote on it. Gen. Statutes, p. 150, §299. This is further evident from the fact that by

the act of 1864 the notice of an intended conversion into a national bank is to be given to the treasurer, and he is to elect for the state whether its stock shall be converted or not. Gen. Statutes, p. 158, §337.

If the state is entitled to the right claimed, that right is of a character which the court will specifically enforce. *Banks* v. *Judah*, 8 Conn., 145 ; *Duncuft* v. *Albrecht*, 12 Simons, 189 ; *Todd* v. *Taft*, 7 Allen, 371 ; Fry on Specific Performance, §28. The court should enforce the right by an order in the nature of mandamus, to compel the admission of the state as a stockholder in the national association. There is nothing in the 13th section of the act of Congress which should prevent the court from making such an order. But if the court are unable by decree to compel the admission of the state, simply because the bank will not provide for an increase of its capital stock, or because the comptroller of the currency has power to prescribe the maximum of increase, then it is the duty of the court to protect the stock of the state in the old bank by injunction as prayed for, on the ground of interfering to prevent a breach of trust. *Dodge* v. *Woolsey*, 18 How., 341 ; Angell & Ames on Corp., §391.

3. But if the stock of the state is not entitled to be represented in the national organization, or, if entitled, it is not in the power of the court to enforce that right or to protect it by injunction, then we submit that the state is entitled to the par value of the stock and its ratable share of the surplus.

(1.) This question has been substantially settled by the Eagle Bank case above cited. The court there held that a holder of non-transferable shares was the equitable owner of the property of the bank in just that proportion in which he owned the capital stock. The same principle was applied in the case of *Phelps* v. *Farmers & Mechanics' Bank*, 26 Conn., 269. The question there was whether a subscriber to non-transferable stock is entitled, in the absence of any statute to the contrary, to a share in the surplus earned before the time of subscription. The court say :—"It is contended that when these corporate bodies subscribe they hold their stock just like other shareholders, and of course are entitled *to*

*share as others in the dividends and property of the bank.* We think this view is the correct one." (2.) The statutes of the State expressly recognise and declare the right here contended for. The act of 1863 provides that every stockholder who shall not consent to have his stock converted shall be entitled to the *"fully appraised value"* thereof. Gen. Statutes, p. 155, sec. 324. (3.) In the next place, the statute of 1865, which is only an amplification of the act of 1863, in order to remove all possible doubt and every pretence for litigation, provides in express terms that all state or society stock which is refused representation in the national association, shall be entitled to receive so much of the surplus of the bank as was accumulated while such stock was so held. Gen. Statutes, p. 156, sec. 329.

*T. C. Perkins* and *O. S. Seymour,* with whom were *Welch* and *Shipman,* for the respondents.

1. The interest of the state in the Phœnix Bank was either that of a stockholder owning non-transferable stock, or that of a depositor.

(1.) The contract between the state and the bank was for non-transferable stock. The state received, accepted, and still holds, non-transferable certificates. After having accepted and held for forty years or more, certificates of a certain class of stock, enjoyed the immunities and exercised the rights of that class of stockholders, without demur or claim of any other right, it cannot now properly assert, contrary to its own acts, that the stock is not what the certificate shows it to be. It would be a breach of faith on the part of the state. This stock, if subscribed under the charter, was subscribed under the 5th section. The clear intent of the legislature was that the 5th and 6th sections should relate to the same kind of stock.

(2.) But, admitting that by the charter the state had the right to subscribe for transferable stock only, then the act of 1803 applies to the case. That act originally applied to only three banks, but when re-enacted in 1821 it was made appli-

cable to all the banks located in the three cities of Hartford, New Haven and Middletown. That act in terms gave the state the right to pay money into the bank, take therefor certificates, and withdraw, not the shares, but the *money* subscribed.

(3.) If the stock is not non-transferable, the interest of the state is that of a depositor merely. Whatever may have been the authority for its subscription, it did take non-transferable stock. On the theory that the state could not, and therefore did not, subscribe for non-transferable stock, it certainly was not subscribed for as permanent stock. The money must therefore have been paid into the bank as a deposit —loaned to or deposited with the bank at a rate of interest equivalent to the dividends. If the state is simply a depositor in the old bank, there is an end of this case.

2. But if the stock held by the state is non-transferable stock, then the question arises, what is the status of non-transferable stock holden in a bank ?

The holders of this stock are quasi stockholders only, and not being voters are not members of the corporation. Non-transferable stock is the creation of the legislation of Connecticut. It is not know to the common law, or to any other state of the Union. While for some purposes, and in some senses, the owner may be considered a stockholder, yet he is very far from being such in the general acceptation of the term. He is destitute of two of the attributes of an ordinary stockholder, the right to vote, and the right to transfer. The court, in *The United Society* v. *The Eagle Bank*, 7 Conn., 475, say :—"Even a suspension of the right of voting, for a limited period, is not incompatible with a right of membership in a corporation." What the consequences would be of a perpetual prohibition of the ordinary right, it was not necessary for the court in that case to decide, but the inference is, that, in their opinion, a *permanent* disability to vote was incompatible with the character of a stockholder. The legislature have since enacted that this class of stockholders shall not vote, and so far as the state is concerned have counter-

acted the decision in the Eagle Bank case, by providing that the state shall be, as to its stock, a privileged creditor, coming next after the depositors in case of insolvency. It is an elementary principle that a corporator must necessarily, at some time, be a participator in the doings and decisions of the corporation. The court in *State v. Tudor*, 5 Day, 333, say :— "From the very nature of a monied institution, the mere owning of shares in the stock of a corporation seems of course to give a right of voting." There were certainly intended to be two classes of stock, with very different rights. The stockholders of this class are quasi stockholders, outside of the corporation, and not members of it, having the right to receive the dividends equally with the regular stockholders, and to disappear at pleasure, always receiving the money advanced ; and, in the case of the state, being a privileged creditor as to its stock in the event of insolvency.

3. The effect of the bank's becoming a national bank under the act of 1863, was to extinguish the non-transferable stock, as stock.

(1.) The act of 1863, authorizing state banks to become national associations, applied only to voting stockholders. This is evident from the terms of the first section :—" Whenever two-thirds of the stockholders, at a meeting called for that purpose, shall vote," &c. Non-transferable stock could not legally be represented at such a meeting. There is no provision in the charter or the statutes for giving notice to such stockholders. They are excluded from participation in the doings or deliberations of the voting stockholders. This is evident also from the provision in regard to non-consenting stockholders. A non-transferable stockholder, under the act of 1863, had not an opportunity to assent or dissent. There was no provision for notifying him of the determination to become a national bank, and no provision for any election on his part if notified.

(2.) It was extinguished because the nature of the stock in a national bank is totally different from the nature of the non-transferable stock in a state bank, and there was no statutory provision by which the nature of the petitioner's stock was or could be changed. Each share of national bank

stock by the act of Congress under which national banks are organized, is entitled to a vote. Sec. 11. And is transferable. Sec. 12. Each shareholder is also individually responsible for all debts of the association, to the extent of the par value of his stock, in addition to the amount thereof. Sec. 12. And no share can be withdrawn. Sec. 38. That section provides "that no association, or any member thereof, shall during the time it shall continue its banking operations, withdraw, or permit to be withdrawn, either in form of dividends or otherwise, any portion of its capital." The national bank stock is in a different atmosphere from the non-transferable state bank stock. A radical change in the nature of the latter is required before it can occupy the status of the national stock. Without express provision authorizing such a conversion is it to be supposed that the legislature intended that regular stockholders could by their votes change the character of the non-transferable stock, without any provision for the consent or dissent of its owners? Non-transferable stock had a vested right to withdraw at any time from a state bank. It is not to be inferred that this vested right to withdraw was to be entirely abandoned, and a double liability imposed upon each share of such stock, unless the legislature had expressly authorized such a transformation. When the legislature is silent, such a presumption is too violent to be entertained. Again, the non-transferable stock was an onus, a great tax upon the banks. It is not to be supposed that this burden was still continued, in the absence of all legislation on the subject.

(3.) This is made very clear by the act of 1864. This act was a contract between the state and the bank. The state grants the bank the privilege of retaining its charter, upon the condition that the bank should admit the state and the wards of the state into the national association. It was not an amendment of the act of 1863, but a supplementary bill, proposing a new mode of conversion, to be adopted, or not, at the election of each bank. And the act of 1863, except as to those banks which elected to accept the provisions of the new act, was not changed or modified. By the act of 1864 the legislature tendered to the banks the choice of retaining

or surrendering their charters, but the retention was always
dependent upon their willingness to carry along their non-
transferable stock.   It should be borne in mind that the act
did not compel any bank to admit that class of stock into a
national bank, unless such bank elected to keep its charter.
The question whether these stockholders are or are not to
come into the new organization, is to be decided by the bank.
Their opportunity to come in is dependent upon the deter-
mination of the bank to keep its charter.   If the banks did
not choose to retain their charters with the burden of keeping
also this class of stock, and elected not to accept the provi-
sions of the act of 1864, it was not applicable in any essential
particular, and the non-transferable stock and the national
bank were left in all respects under the act of 1863.   If the
non-transferable stock was admitted and included in the na-
tional banks by the act of 1863, why was the admission of
this stock made by the act of 1864 a condition to be complied
with by the banks in order to retain their charters ?   The very
object of the act of 1864 shows that prior thereto, and in all
cases in which banks elect to surrender their charters, the
state has no vested right to its stock, as 'stock, and the pro-
visions of the act prove that but for that act, and only in
cases where banks 'choose to accept it, the state had no part
or lot in the conversion, or in the disposition of its stock.   Not
until *after* the determination to become a national bank is
the state to be notified, and not until after notification can
this class of stockholders elect, and then they must notify the
bank.   Without all these steps they have no right as stock-
holders in the new bank, and without notification of their
election they have not in ordinary cases any right to the
stock.  Meanwhile, pending the decision of these stockholders,
the amount of the stock is kept an elastic quantity, enlarging
as the charitable societies elect to take the stock; for an ac-
ceptance of the act of 1864, by any particular bank, was in
effect an acceptance of a power to increase its capital stock,
so as to include that amount of the non-transferable stock
which should elect to come into the new bank.   The provision
that the banks *already organized* under the act of 1863 must,
in order to retain their charters, give the non-transferable

stockholders an opportunity to come into the new organization, establishes the position that by the act of 1863 this stock was excluded from participation in national banks. The legislature could not have believed that the charitable stock was already included in the national banks previously organized, or it would never have been made a prerequisite to a retention of their charters, that the non-transferable stock should be notified, and their stock added to the capital of the national associations. Such banks had the choice either to retain their respective capitals as already established in their articles of association, by which the non-transferable stock had been excluded, or to increase their capitals by permitting this quasi stock to come in. The state gave the banks this option ; it by no means made the admission of the non-transferable stock imperative upon the banks which did not elect to retain their charters. The inference from this provision in regard to previously organized national banks is very strong, that there could have been in the act of 1863 no purpose on the part of the legislature that this quasi stock should be recognized in the national banks. Non-transferable stock was not included in the national banks organized prior to the act of 1864, else this provision is useless and absurd. If the bank surrenders its charter, there is no provision, either in the law of 1863 or of 1864, by which the non-transferable stock can be recognized as stock. The act of 1864 was a new provision, passed in part for the benefit of the state and the charitable societies, and established a new principle, to wit, that they might in a certain contingency have the power of changing the nature of their investment and becoming regular stockholders in a national bank. Before the passage of that act the only question had been as to the amount of money which this class of stockholders was entitled to receive. The fundamental idea of the 8th section of the act of 1864, is that the privileged stockholders ceased necessarily to exist as stockholders, unless, by electing to accept the provisions of that act, for the sake of and in consideration of a retention of their charters, the banks chose to give them an opportunity to come into the new organizations.

(4.) In determining the effect of the statutes, we must be governed solely by the acts of 1863 and 1864, which were passed prior to the organization of this bank. The act of 1865 was passed after this controversy had arisen and this petition had been brought, and expressly excepted from its operation any pending suit. The state by subsequent legislation may change remedies and remove penalties, but cannot unreasonably modify existing rights.

(5.) The fact that the law of 1863 refers only to voting stockholders, answers also the question as to the two-thirds vote required to carry the bank into a national organization. Its language is, "whenever two-thirds of the stockholders, at a meeting called by the board of directors, shall vote." The directors summon only the voting stockholders, for they only can vote. The voting stockholders only are the persons who can determine the question, they are the legislative body. The "two-thirds" means, as a Massachusetts statute in a similar case reads, two-thirds of the votes which all the stockholders, if present, could cast; in other words voting stockholders. Suppose the voting and non-voting stockholders were equal in number. On the petitioner's construction, two-thirds could never be obtained. The privileged stock was not to be notified, by the law of 1864, until after the determination to become a national bank, and the question whether the bank should or should not become a national bank depends upon the wishes of two-thirds of the stockholders having the capacity to vote. They were the only persons who could be present and vote in "the meeting called by the directors," and are the governing power of the bank.

(6.) But it is said that the act of Congress requires an assent of two-thirds of all the stock. We reply that the proper construction of the act is a requirement of an assent of two-thirds of the stock entitled to assent. The language of the act is, "said certificate shall declare that the owners of two-thirds of the capital stock have authorized the directors to make such certificate, and to change and convert, &c." It is obviously implied that the authority should emanate from the owners of two-thirds of the capital stock entitled to au-

thorize, and that two-thirds of the stock entitled to vote should make the change. We have fully complied with this act, and obtained an assent to and ratification of all our acts by more than two-thirds of the stock, upon any construction of the statute, and the bank is a corporation under the United States law, and so certified by the comptroller of the currency.

4. If the state was of right entitled to stock, the facts found show that there is no ground for interference by a court of equity by injunction.

(1.) The state has been excluded without fraud or *mala fides*, and with the concurrence of the state directors, the officers of the state, who had full knowledge of the facts. The gist of the bill is fraud. Upon that the state bases its prayer. If the allegations in regard to fraud and conspiracy had been found to be true, and the fraudulent acts were in progress, an injunction might perhaps properly have been granted; but no fraud is found, and the whole tenor of the finding is consistent with the good faith of the bank. The conversion was made, in part, by the act, vote and consent of the state directors, acting also honestly. As the allegations in regard to fraud have not been proved, this violent remedy by injunction should not be granted, especially as the state has an adequate remedy in damages.

(2.) The acts of the respondents, which are complained of, had all been done before the date of the bill. The conversion had been made, the capital fixed, the state stock not recognized, the certificate of the comptroller issued, the new bank had gone into operation, and the assets of the old were, at the date of the petition, in the hands of the new. An injunction issues to *restrain*, not to *punish ;* as a preventive not as a premonitory measure. In this case, if granted, it cannot act as a restorative measure for the reason hereafter mentioned.

(3.) The remedy by injunction should not be granted, because unnecessarily and irreparably injuring the bank, while an adequate compensation in damages can be given to this class of stockholders. 2 Story Eq. Jur., § 959 *a* ; *Bonaparte*

v. *Camden & Amboy R. R. Co.*, 1 Baldwin, 218 ; *Whittlesey* v. *Hartford, Providence & Fishkill R. R. Co.*, 23 Conn., 421. The capital of the bank has been fixed. By the act of Congress it cannot be increased without the consent of the stockholders and of the comptroller of the currency; and then, by the articles of association, as well as at common law, the increase must be divided among the stockholders *pro rata.* So that, practically, the stock having been once established, can not be increased to the benefit of the state ; and the state is here asking an impossibility, or a destruction of the bank.

5. What amount of money is due to the state upon its investment ? The state claims par and surplus, the value of the regular stock. The bank claims that the money paid by the state, and the interest from the date of the last dividend, is all which is due.

(1.) The equities of the case are against the claim of the state. The non-transferable stock is a privilege conferred by the legislature upon the state, and other objects of its bounty. It is a tax upon the banks, a bonus to itself. The privilege is a great one, of not having their investment, except in very extraordinary circumstances, diminished ; of always receiving their principal, with the risk only of occasionally losing a dividend. They can place their $100 in a bank where it is paying ten per cent. and the other stock is worth $125, gain in dividends the benefit of the extra $25, and run no risk of being obliged to sell below par. With no risk of loss by depreciation of the stock, they ought not to have the additional benefit of a rise in the stock if the bank is successful. It is a sufficient burden upon the bank to be compelled always to receive the money of these corporations when money is abundant and not wanted, and to pay it in full when times are hard and all the capital is needed by its customers. It is most inequitable to compel the bank to divide its surplus among these drones who have incurred no risk and endured no hardship. They are asking too much. With their principal and dividends they should be content. They have been prompt to demand the full amount subscribed when the stock

was below par. That is all which is justly due in any event, and at any time.

(2.) But it is claimed that by the act of 1855 the state is entitled to its pro rata of the surplus. That statute has reference only to those who subscribe after 1855. *Phelps* v. *Farmers & Mechanics' Bank*, 26 Conn., 271. It can not be claimed that upon a voluntary withdrawal these corporations would be entitled to any more than par under this statute. The statute has nothing to do with a case of this kind, but, as construed by the supreme court, has reference simply to the reception of dividends by the non-transferable stockholders, so long as they remain stockholders. In that case the court say, (page 272) : "The profits of a bank, no matter when made, until separated from the stock by declaring a dividend, are mere increment and augmentation of the stock." "If a bank has a certain defined surplus, which has actually been separated and made distinct, and is so known and treated by contracting parties, or by the statute, it is possible that it may, in that case, be held to possess a new character, and be dealt with accordingly—but it must be a very peculiar case, differing essentially from what we have here." Thus the court do away entirely with the effect of the act of 1855, by deciding that in ordinary cases it is inapplicable, that the surplus can only be a known and ascertained quantity when separated from the rest of the stock in the form of dividends, to which dividends these stockholders are entitled. Meanwhile the undivided profits remain a part of the capital.

(3.) If the stockholders voluntarily withdraw, they are entitled manifestly to only par. They can either voluntarily withdraw, or, being the creature of the legislature, and constantly under its control, can be ordered to withdraw. There can be no doubt that the legislature could at any time have ordered all the non-transferable stockholders to withdraw upon the terms upon which they subscribed. When the state authorized the bank to surrender its charter, and instantly to become another corporation under the control of another power, without making any provision for continuing these quasi stockholders in life, and the change is made in any

bank, it is a statutory withdrawal of all the funds of the state. The state has said, "We permit the bank to adopt a new charter, and to go under the control of another power. We relinquish our control. The character of the new corporation is inconsistent with the nature of our stock. We therefore retire and withdraw." This is evident from the peculiar language of the act of 1863. When two-thirds shall vote to become an association under the laws of the United States, "said bank shall be deemed to have surrendered its charter." The bank is at an end ; not wound up, assets not to be divided, but under another charter, and amenable to other laws, pursuing its way. This peculiar kind of stock of the state is withdrawn by authority of the state, and ceases to exist with the surrendry of the charter. It is a voluntary withdrawal by the power which created the stock.

(4.) The principle adopted by the legislature in regard to stock of this class, is that the subscribers shall always, if possible, receive their money without diminution. The rule of payment should be a uniform and permanent one, the same when the stock is below as above par. They cannot have two systems of payment, to either of which they can resort at pleasure. If the value of the stock is the rule, then the subscribers can only receive the value of the stock when below par. If at the time of the conversion of a bank there is no surplus, and the stock is depreciated, what would they then claim ? That they were entitled to the value of the stock only ? Would they not justly contend that the legislature had authorized them always to receive from solvent banks the amount invested, and that that they must have ? If so, the principal is all they are entitled to receive now. The entire absence of legislation previous to the date of this bill, on the subject of payment of non-transferable stockholders, shows that no new principle was intended to be introduced. The idea in creating this stock always had been that the owner should receive the amount paid in, and no more. The act of 1855 shows this. It is not to be inferred, in the absence of all legislation, that the legislature intended to vary or alter the established principle upon which they had always acted.

(5.) As the act of 1864 shows that the non-transferable stockholders have no vested right to continue as stockholders, so it shows that they have no vested right in anything but the principal paid in, and the dividends theretofore earned. If the state elects not to go into a national bank it can receive but par, and, as a matter of equity, interest, and thus the legislature have indicated what they supposed the rights of the state to be. It cannot be claimed that the provision that the state should receive only par upon its non-election to go into a national bank was a penalty for not making a different decision. The state is not wont to inflict penalties upon itself, and there was no propriety in making a discrimination against those who did not choose to embark in national banks. By the act of 1863 the state gave itself no authority to become a stockholder in a national bank. By the act of 1864, in the event that the state elected not to become such a stockholder, it is entitled to receive par and interest from the last dividend. Is not the amount of money due the state precisely the same in one case as in the other ? Has not the state settled for itself the rule of payment ?

BUTLER, J. We cannot assent to the proposition that the state, and other subscribers to the non-transferable stock of the respondent bank, became, by subscribing, depositors or creditors. That such subscribers became shareholders or stockholders, and members of the corporation, was decided in this court in the case of *The United Society* v. *The Eagle Bank*, 7 Conn. R., 456. The case was determined by two judges only, the others being disqualified. But the decision, and the reasoning of the court in support of it, command our deliberate approval. So far as the able arguments to which we have listened, made in favor of the proposition that such subscribers did not become stockholders, are founded on analogies which had their origin in the rules applied to determine the relative rights and duties of individual corporators where the charters were in general terms, they are without force. It was competent for the legislative power to constitute this corporation the *special* and *peculiar* being

which the petitioner claims that it was; and if they did in fact give one class of members the entire control and management, and another class a right of withdrawal and restrain them from transferring their stock or voting upon it, intending that they should be members nevertheless, the differences made cannot be legitimately urged as a reason why all could not, or did not, become members pursuant to the legislative will.

Nor, on the other hand, do we assent to the claim that the state should be considered a transferable stockholder. For if we were of opinion that it might have become such, originally, under the provisions of the charter, we should not hold that it was such now. The state did not elect to become such, but as to the shares in question became a non-transferable stockholder, and has ever so considered itself, and so been treated by the bank, and it does not comport with justice, or the dignity of the state, to claim the benefit of a different construction at this late day, even if not technically estopped. The state must therefore be considered a non-transferable or qualified stockholder; and we come to the question, what was the effect of the re-organization of the bank as a national institution upon the shares of the stock owned by the state.

It is conceded that the stock is not now represented in the national organization. Has the state then a right to be thus represented? and have we any power to enforce that right? We are of opinion that both these questions must be answered in the negative.

The act of Congress providing for the organization of national banking institutions was intended not only to provide for the organization of new banks, but to absorb the old, and establish a general exclusive banking system for the whole country. It therefore provided for the re-organization of the existing state banks. The existence of a class of qualified stockholders in some of them does not seem to have been contemplated or specially provided for in the act. Its provisions are in general terms, and contemplate the re-organization of the state banks as they then existed. The language used is

sufficiently broad and comprehensive to enable the voting stockholders—the *managers* of a bank constituted as this was—to transfer the entire institution, including the non-transferable stockholders, and the entire capital and assets, and organize all under the provisions of the national law. The remedy of the non-transferable stockholders, in the absence of other state legislation adapted to the case, was in their right of withdrawal and in that only. If therefore there had been no state legislation in respect to the re-organization of this bank, the non-transferable stockholders would have been carried into the national organization, by a transfer of all the capital and assets, unless they chose to avail themselves of their privilege to withdraw, and it would not have been in the power of the bank to exclude them against their consent.

But the legislature, in 1863, while this bank existed only under the laws of the state, authorized them to *surrender their charter*, for the purpose of entering into a national organization, and they did so surrender. Both the surrendry and the re-organization were necessarily the work of the absolute stockholders. The act of surrendry, preceding the act of re-organization, divested the corporation of existence under the state laws, to the extent provided for, and divested the qualified stockholders of all further rights, except their right of equitable ownership in the assets of the deceased institution. The absolute stockholders therefore on such surrendry were absolved from any further obligations to conduct or continue the business for the benefit of the qualified stockholders; and were at liberty to re-organize under the national law, like any other number or class of individuals.

The effect then of the act of 1863, authorizing a surrendry of the charter, was to authorize the absolute stockholders to discontinue the business in connection with the qualified stockholders, and to carry the qualified stockholders into the new organization or not, as they and the qualified stockholders might agree.

But it is said and conceded that the bank did not re-organize until after the act of 1864 took effect. If that act was

binding upon the absolute stockholders whether accepted or not, then they were bound to carry the qualified stockholders into the new organization, if they elected so to be carried, pursuant to its provisions.   But looking at the whole purpose and tenor as well as at the particular provisions of the act of 1864, we are of opinion that it was not absolutely binding upon them in that respect, but that it was optional with them to accept its provisions, or to act under the law of 1863, and without regard to them.  They did so act; and it follows that the state and other qualified stockholders have now no right to insist upon a representation in the stock of the bank.  The act of 1865 does not apply to the case.

This view of the case renders a further consideration of the power of this court to interfere in respect to the stock, unnecessary.

Another material question is made as to the right of the state to a share of the surplus.

If, as we have assumed, the managing stockholders of the bank surrendered its charter, and it ceased to be a bank before entering into the national organization, with the assent of the state and by its authority, and they thereby severed their connection with the qualified stockholders, it follows logically that the qualified stockholders were entitled to such a distribution of the assets as they would have been entitled to if the affairs of the bank had been wound up, or its assets had been sold bodily in the market; and that clearly would have been a full share of all the assets or avails of the sale.

We do not assent to the claim that the absolute stockholders had any *equitable* right to require these qualified stockholders to accept par and interest for their stock.   They had no such equity.   The granting of the charter originally was a great privilege, and the reception of these qualified stockholders, with all the rights conferred upon them, as qualified members of the corporation, was not only one of its provisions, but one of the inducements to the grant; for the charter was deemed valuable beyond the amount of the capital.   And the whole capital, as constituted by the subscrip-

tions of the qualified stockholders as well as the absolute stockholders, was employed in producing the surplus. Moreover the accumulation of the surplus was not an essential part of the business of the bank. It was organized upon the idea that its earnings would be divided as earned, and a court of equity would have compelled a division of them if unjustly or unduly accumulated and withheld, for every stockholder, qualified or absolute, became an equitable owner in the earnings as soon as earned, and entitled to an equal share in and a reasonable division of them.

The only remaining question is, what advice shall be given to the superior court in relation to the enforcement of the rights of the state.

By the act of 1863 the charter of the bank, although deemed to be surrendered, is preserved so far as is necessary for winding up its affairs, and prosecuting and defending suits. The bank claims the benefit of that act, and makes no objection to the form of this proceeding; and it is competent for a court of equity, which has obtained jurisdiction for one purpose, to proceed to a final disposition of the whole matter involved. The superior court is therefore advised to take the account, ascertain the value of the capital and accumulations at the date of the surrendry of the charter and re-organization, and the proportionate interest of the state therein, and pass a decree for that amount, and enforce the same by penalty or execution.

In this opinion the other judges concurred.