SALT LAKE CITY, a Municipal Corporation, Appellant, THE UTAH & SALT LAKE CANAL COMPANY, a Corporation, Respondent, v. THE SALT LAKE CITY WATER & ELECTRICAL POWER COMPANY, a Corporation, and Others, Respondents.

No. 1319.    (71 Pac. 1069.)

1. Waters and Water Courses: Primary and Secondary Uses: Appropriation: Appeal: Findings: Conclusiveness.
   Where the evidence is not before the court on appeal, it is concluded by the findings of the trial court.

2. Same: Vested Rights.
   The abrogation by a city of an agreement between it and a power company, whereby the latter was permitted to devote water primarily appropriated by the city to a secondary use, can not divest rights which had become vested by the agreement, and thus invalidate the appropriation once complete.

**3. Same: Findings: Supported by Evidence.**

Where it was shown by plaintiff's evidence that a secondary appropriation of water had been made by defendant, and water actually used thereunder by agreement with plaintiff, plaintiff can not successfully contend that a finding that a valid appropriation had been made was not supported by the evidence.

**4. Same: Rights of Primary Appropriator.**

A primary appropriator of water can not complain of a secondary appropriation where there is no interference with, or abridgment of, the primary use.

**5. Same: Usufructuary Right.**

The right to the use of water is, under the law of appropriation, as under the common law, merely usufructuary. BASKIN, C. J., dissenting.

(Decided April 1, 1903.)

ON REHEARING.   FORMER OPINION AFFIRMED AND JUDGMENT
BELOW AFFIRMED.

(For former opinion, see 24 Utah 249; 67 Pac. 672.)

*George L. Nye, Esq.,* city attorney, for appellant. *Messrs. Richards & Varian* of counsel.

*Messrs. Bennett, Sutherland, Van Cott & Allison* for United States Mining Company.

*Ogden Hiles, Esq.,* and *L. R. Rogers, Esq.,* for Power Company.

BARTCH, J.—This case was before us on a former occasion, and the judgment of the lower court was then affirmed, Mr. Justice Baskin, dissenting. 24 Utah 249, 67 Pac. 672. Thereafter a petition for rehearing was granted, and the case argued and submitted.

In preparing the opinion on the former occasion, the writer was not unmindful of the great importance of the rulings therein as affecting the material interests and progress of the people not only of Salt Lake county, but also of the entire State. With these things in view, a very thorough examination of the record and of the law applicable thereto was made, resulting in an irresistible conclusion that the learned trial judge had made a decision not only just and wise, but sound in law, and which ought to be upheld, as an application of the principles growing out of and adapted to the peculiar conditions and necessities of our arid country. Having now again given the case and the opinion of the court very close scrutiny, the same conclusion is still, in our judgment irresistible, being the more firmly convinced that it is right and that the judgment is just. We must therefore adhere to the former opinion of the majority of this court, as the correct exposition of the law applicable to this case, and give that decision our final judicial sanction, notwithstanding its correctness has been challenged with so much zeal by the learned counsel for the appellant who presented the oral argument on rehearing. In their brief the counsel say this decree discloses to them an interference with the vested rights and a disturbance of existing law, and that, if this decision is perpetuated, it can but result disastrously in the administration of the law of appropriation of water in this State; but they failed to refer to a single fact in evidence or to the application of the principle of law to support this contention. It is true they assert that the power company arbitrarily closed the city's headgates and diverted the water to which the city was entitled; but upon what facts in evidence, if any, this charge is based, does not appear, and, even if it were admitted that the power company perpetrated unwarranted, arbitrary acts, how could that justify the statement that the decree interferes with vested property rights, or that the former decision of this court will be disastrous

in the administration of the law of appropriation.  Certainly there is not to be found even a hint in either the decree or the opinion of this court that can be fairly construed as in any manner countenancing arbitrary action on the part of either party to this controversy.  Nor have counsel referred to any facts in evidence or anything in the record which warrants such an assumption.  In this case the evidence never was before us.  We were simply called upon to ascertain whether or not the decree was sustained by the findings of fact, and to determine the law applicable to the case. There was no question whatever made or presented as to whether the findings of fact were supported by the proof, and we, having had no opportunity to look into the evidence, were, under numerous decisions of this jurisdiction, bound by the findings of the lower court.  That court had found that the power company had made a valid appropriation of the water for a secondary use, but, notwithstanding such finding, appellant then contended, as it now contends, that there was no appropriation, because, as is urged, the power company never put the water to actual use.  But was there never an actual use of the water by that company?  The record, in the action of the power company against the city to condemn an easement and acquire the right to connect the flume with the city's canal, clearly answers this question in the affirmative.  The judgment of condemnation therein has been affirmed by this court, 25 Utah 441, 71 Pac. 1067, and from the evidence disclosed by that record which we may now properly look into, it appears that the power company, before any litigation arose between these parties, had made an actual use of the water for the purposes intended. The appellant's engineer, the witness Kelsey, who was in the employ of the city at the time the connection of the flume with the city's canal was made, said he knew that at one time the power company used the water through the power house and delivered it into the city canal under some agreement between the city and the

power company, but that he did not know how long that use occurred before the agreement was abrogated. So, the appellant's witness Doremus, also an engineer of known ability, referring to the matter of discharging the water, after use by the power company, into the city canal through the flume undiminished in quantity and undeteriorated in quality, said: "In my opinion, it is practicable to do that with proper appliances and devices."

It thus appears from the appellant's own evidence that the very thing which it was claimed had not been done, and the omission of which was urged as fatal to a valid appropriation, had actually been done, and that the plan of the power **2, 3** company to discharge the water into the city canal is practicable. The mere fact that the city, after the power company had been using the water for the purposes for which the appropriation was made, by abrogation of its agreement, and a resort to litigation, prevented its further contemplated use, pending suit, could not have the effect of defeating rights which had become vested by consent or agreement, and of invalidating an appropriation of water which was then complete. So that it now transpires that the finding of the court respecting the appropriation was, after all, made in accordance with existing facts. From the same record it further appears that the power company is compelled, by decree of the court, to keep in ordinary repair and condition, at its own expense, all that portion of the city's canal extending from the point of connection of the flume with the canal to the headgates, each and every year, so long as the company shall use any part of that canal to flow water therein, and so long as it shall use any portion of the city's water through its plant and flume, the city being thus saved the expense of keeping that portion of its canal in repair. And, that there might be no infringement on the rights of the city in the use of its water, the court retained original jurisdiction of the cause, and appointed a commissioner, whose duty it is to see that there is at all times

a faithful compliance with the decree, and to report from time to time to the court any violation of the provisions of the decree. Notwithstanding this, however, and lest there might be some question about the validity of the appropriation by the power company, let us now apply the test of the counsel for the appellant appearing in their brief. After admitting that no right in the water, as such, exists, while it flows in the natural stream they say: "Before a right in the use of the water can become vested in any appropriator several things must eventually concur: First, there must be a bona fide intent to take the water of a stream and apply it to some beneficial use; second, concurring with this intent, there must be an actual diversion of the necessary quantity; and, third, the application of the water, so diverted, to the contemplated use. Neither one of these acts nor the intent alone can constitute an appropriation. When all these steps have been taken, and the work completed, and the water actually used for a beneficial purpose, the appropriation becomes complete."

Assuming that this, appellant's own test, for the purposes of this case, is the correct one, then how will its application affect the power company's appropriation? That the company intended to take the water of the stream for a beneficial purpose, which is the first step under the test, no one attempts to deny. In fact, this was the initial step or thing that resulted in this controversy. The intended use was for the propelling of a power plant to furnish light, heat, and power to the people of several neighboring towns, and this was certainly a beneficial use. Nor is it controverted that concurring with such intent the company has complied with the second requisite of the test by having diverted the necessary quantity of the water. As to the third requisite, appellant's own testimony now, as we have seen, shows that the water so diverted was applied to the contemplated use. Indeed, all this is admitted by the counsel for the appellant, in another part of their brief, when they say: "In its sim-

plest form, the case may be stated thus: The power company, desiring to use the water for power purposes at a point on the river below the headgates and point of diversion by the city, arbitrarily closed the city's headgates, and diverted the water to which the city was entitled into a canal on the other side of the river; thence it conveyed the water to its plant a mile and a half below, where, after use, it returned it into the city's canal through a flume connected by the power company."

It will be observed that here is a clear admission that the power company, desiring the water for power purposes, diverted it, and then used it through its plant, and returned it into the city's canal through the flume, which is all that is required by the test to make a valid appropriation of water; and the appellant's own evidence, as we have seen, shows that such use is practicable, and was made with the consent or agreement of the city. In the face of all these things, and under the facts and circumstances shown by the findings of fact and evidence, how can it be maintained, or with what consistency can it be said, that these decrees and decisions overturn vested property rights and disturb existing law? Is the alarm expressed justified by the facts? Are not the matters which the counsel have assumed to be of the substance and utility of the law, and which have prompted the assertion, after all mere inconsiderable trifles of legal technism? We apprehend the records in the two cases will be searched in vain for any fact or facts in evidence, or for a single expression in the findings of fact or decrees, which justifies the alarm respecting the decisions affirming the judgments and decrees, or which shows that the usufructuary right of the city to the water, which it diverted under the law of appropriation, has in any way been interfered with or jeopardized.

Again counsel say: "More than half a century ago the miners of the Pacific Coast declared that the common law rule, predicated upon the rights and necessities of riparian owners, was not adapted to the conditions of the time and people, and

by custom they created a new right and a new rule. Perhaps only a new application of common-law principles was made. In any event, the law of prior appropriation was established by the custom of the miners, and it at once and thereafter always found full recognition in judicial decisions and legislation."

To this it may, as a matter of common knowledge, be added that it was not only the conditions of the time and people, but also the condition of this arid country, that caused this change in the common-law rule. On account of the lack of precipitation, and in order that the barren country might be rendered habitable and profitable, and its hidden resources developed, the water was turned out of the streams, and conducted to places where, after use, it was impracticable, in many instances impossible, to return it to the stream in which it was wont to flow, and thus the doctrine of riparian rights was changed, or rather modified, as far as necessary, so as to harmonize with the necessities existing, and, as counsel say, a new right and a new rule created, and ever since recognized by judicial decisions and legislation. But, granting all this, was not the use of the water the substance of the "new right" thus created, and which required the modification of the then existing law? If the new use was such substance, which counsel seem to admit when they say, "If the appropriator was interfered with in his use of such water, he found a swift and adequate remedy in an action at law or a suit in equity," how could the appropriator complain so long as there was no interference with its use? How can the city complain so long as there is no manner of interference with its use? There has not been a scintilla of evidence before us, nor is there a single sentence in any finding of fact, which shows that the appellant has in fact been injured in the least by the industrial enterprise which the city, for what cause it is difficult to comprehend, is now seeking to throttle and force out of existence by judicial decision, to the discomfiture of many subjects of this

commonwealth. On the contrary, besides being a participant in the general benefit, which such an enterprise naturally brings to the locality where it is located and to the State, the appellant, while suffering no injury, as shown by the evidence of its own witnesses, is the recipient of positive pecuniary benefit, in that, by decree, a considerable section of its canal must be kept in repair by the power company, thus relieving the city from that annual burden and expense.

Let us now see whether the decision herein is quite so startling, and so disturbing of existing law, as has been claimed. We have seen that the peculiar conditions existing in this arid region, and the demands of the times and people for the development of its solid and hidden resources, impelled in accordance with the requirements of an industrious and enterprising people, and the progress of a growing country, a modification of the doctrine of riparian rights. That doctrine had come to us through the centuries—from time immemorial—and had withstood the wisdom of the sages of the law, the language of which is, "*Aqua currit et debet currere, ut currere solebat;*" and yet in the course of human endeavor, progress, and events it was ascertained that either that doctrine must be modified or that this country must remain a barren waste. The result was a modification, dictated by the law of necessity and countenanced by judicial decision and by legislation, to the extent of creating a right in any person, by complying with certain preliminaries and requisites, to use the water of a stream for any beneficial purpose, without, where it is impracticable or impossible to do so, returning the water into the stream. This right to use the water of a running stream now exists alike for mining, manufacturing, and agricultural purposes. At common law a riparian owner below was entitled to no redress against his neighbor above for the use of water when no injury resulted, not unless the water was deteriorated in quality or materially diminished, the maxim being, "*De minimis non curat lex,*" and in this re-

spect there is no change under the law of appropriation. Indeed, it would be contrary to the universal sense of mankind to permit redress where there has been no wrong. 'At common law the right to use such water is usufructuary merely; 4, 5 so, likewise, under the law of appropriation. Neither at common law, nor under the law of appropriation, does the proprietor or appropriator own the water in the stream. Therefore, so long as the use is neither interfered with nor abridged, an appropriator has no just cause to complain, although another proprietor above him also uses the same water for a beneficial use.

Is it not clear that the case at bar falls strictly within these principles? The power company owns the land on which its plant has been erected, and the land borders on the stream. It is therefore a riparian proprietor, has diverted the water for power purposes from the stream where the water is *juris publici,* and, except for the modification of the common law, the company would not only have had the right, but it would have been its duty, to return the water into the stream instead of the canal, and the city in its use lower down would have had no ground for an action, unless the water would have been impaired in quality or materially diminished in quantity. The city, however, having previously acquired the right to use the same water, under the modification of the common-law, or the law of appropriation, the power company is bound after use to deliver it in such manner and place as in no way to interfere with the city's use. This is precisely what the power company sought to do, what the city, in the ·first instance, as we have seen, permitted it to do, and what the decree of the trial court and the decisions of this court require it to do. The appellant enjoys the same rights, with less expense in the maintenance of its canal, that it had before the power company made its appropriation, and without any restrictions, so far as the decrees and decisions are concerned, as to changing its place of diversion and use. Such being the

25 Utah—30

case, what new and alarming doctrine has been herein established or applied? What vested property rights have been overturned? Is not this alarm founded more upon conjecture of what possibly, not probably, might happen in the future than upon anything substantial? Imagination may picture this city and valley in the near future destroyed by an earthquake, but, so far as human eyes can discern, it is not probable. So, it may be confidently asserted that, guarded as the rights of both parties to this unfortunate controversy are by a court of equity, it is not probable that any serious injury can or will befall the city, or the best interests of the State, because of the decrees and decisions herein. Not a single principle has been applied in this case that is not embraced either in the law of riparian rights, or its modification, the law of appropriation. But suppose it were conceded that the law of appropriation were susceptible of a construction that the ditch which carried the water constituted a right of property so absolute in the owner that no connection could be made therewith, nor any easement created therein or over it, would equity transcend its bounds to an alarming extent by limiting or restricting the modification of the common law in its application to the use, when the condition of this arid region, which demanded that departure, the progress of the times, the furtherance and encouragement of industrial and manufacturing enterprises, and the development of resources demand such limitation? We think not.

It is a matter of common knowledge, of which a court may take notice, that we are surrounded by conditions peculiar to this section of country. Located in the very heart of the arid belt, the soil is utterly useless without the application of water. In this valley, as in most other valleys of the State, all the water of the streams has been diverted, in ditches mostly, as in this instance of the city canal, for purposes of irrigation and domestic use. If, therefore, no industrial or manufacturing concern or plant could lawfully appropriate

water as and in the manner the power company did in this case, for a secondary use, all manufacturing enterprises which require water for operation would be dependent upon the mere will or caprice of the owners of ditches, for they could permit such secondary use or not as they might choose, although such use for power purposes would in no way, as in the present instance, interfere with their use of the water. If, then, these conditions and circumstances existing, the law of appropriation could be so construed as to permit such a broad application as is contended for in this case, an application alike inimical to useful and beneficial enterprises, progress, and material interests of the community and state, would not a court of justice be warranted in imposing a limitation? Shall the strong arm of equity, under such circumstances, be employed to cripple, if not annihilate, a commendable, useful, important enterprise, reared at an expenditure of much capital, and notice thereby served upon all that this is no place for industrial or manufacturing concerns? In our judgment, upon very careful consideration of the whole controversy, the law as well as justice demands an answer in the negative.

As said in the former opinion of the majority of this court, this is a case where the two uses can stand together without injury to the prior appropriator, and where there is no injury equity will refuse a recovery. That the decree herein is just, under the circumstances, and ought to stand, is emphasized by the fact that, of the very numerous parties, prior appropriators of water from the same stream, to this action, the city is the only one to complain, or to express any alarm because of the decision. That, for its own welfare—for its material advancement and that of the State—the city ought to encourage rather than discourage the location of industrial enterprises like the one in question it would seem there can be no doubt. The undertaking is in harmony with the progressive spirit of the times. Neither the establishment of the plant

nor its operation violates any law.    It utilizes electric energy which is destined to revolutionize the various methods of promoting power and propelling machinery.    In its operation the water used is neither impaired in quality or diminished in quantity, and the city, having, at the beginning of the operation of the plant permitted and sanctioned the use of the water, ought not now be heard to complain without showing resulting injury.

On account of the grave importance of this case, we have thus set forth upon this rehearing our reasons for upholding the decision of the majority of the court herein, and for again affirming the decision and judgment, without any alteration in the former opinion.

The judgment is reaffirmed.

McCARTY, J., concurs.   BASKIN, C. J., dissents.