THOMAS C. PERKINS ET ALS. *vs.* ARTHUR D. COFFIN
ET ALS.

First Judicial District, Hartford, March Term, 1911.
HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

Averments as to the powers of a private corporation where its charter
   is embodied in the pleading, and as to the effect of amendments
   thereto, also set out, are averments of conclusions of law which
   will be disregarded save as they are well founded.
In determining whether or not there was error in the sustaining of a
   demurrer, the question is as to its sufficiency, and not as to the
   sufficiency of the reasons assigned by the trial court.

An amendment to the charter of a private corporation offered for acceptance as an entirety must be accepted as offered.

Where an amendment embodying a variety of powers is offered for acceptance by a majority of the stockholders, and certain of these powers entirely separable from and independent of the others are such as the majority may lawfully accept on behalf of the corporation, acceptance of the amendment by the majority will be effectual as to those matters, although ineffectual as to other matters.

The charter of the Connecticut River Company, originally granted in 1824, contained no reservation to the State of a right to alter, amend or repeal. In 1856, at the request of the corporation embodied in a vote passed at a stockholders' meeting, the legislature passed a resolution amending it. No formal vote of the stockholders accepting the amendment was ever adopted, but the corporation has ever since exercised the powers contained therein in a manner to become known to every stockholder. *Held* that an acceptance of the amendment would be implied, and that, therefore, under § 3315 of the General Statutes, the charter had become an open one.

Alterations in the charter of a corporation which make a material or fundamental change therein will not become operative unless accepted or assented to by all the stockholders. Those which make auxiliary or incidental changes only will become operative upon acceptance by a majority.

The right of the majority to rule in respect to charter changes of the latter class, as in all matters relating to the corporate business and policy within the authority of the charter, is implied in the contract into which the stockholders enter.

There is no exact formula for ascertaining what changes are fundamental and what incidental. Each case must be determined upon its own peculiar facts.

The original charter had in view the large public purpose of improving the navigation of the Connecticut River by means of artificial constructions which would enable transportation to avoid Enfield Falls, and secure safe passage by the use of canals with locks. Its purpose was to achieve this result through the agency of private capital and enterprise. To enlist the aid of these agencies, inducements were held out in the form of rights and privileges embodied in the charter. Among these rights and privileges were those of owning boats for river commerce, of building wharves and piers along the river banks, of collecting tolls, of purchasing and holding mills, mill sites and manufactories adjacent to the falls, and of holding, selling or leasing them at will. An amendment made in 1881 expressed as one of its purposes the preservation and maintenance of the company's "water power." *Held:*—

1. That the rights and privileges conferred upon the corporators as

the reward of their undertaking were as much within the main design of the charter and as much a part of its plan and purpose as any other features of it.

2. That these rights and privileges, in view of the charter provisions and purposes and of the conditions involved in the situation, included the right to utilize or sell for use by others the energy latent in the fall of the water subjected to the corporation's control and diversion.

3. That a charter amendment which authorized the corporation to utilize this energy to the same end as formerly, but by a method which involved its conversion into electricity and transmission to the point of use by means of an electrical generation and transmission system, was not one which created a fundamental change in the corporate powers, and therefore might be accepted by the consent of a majority of the stockholders.

The fact that the exercise of the new power would involve large and costly constructions, the employment of large capital not already possessed by the company, the expenditure of large sums, and the creation of heavy financial burdens, obligations and hazards which might result in the destruction of the present value of the stock, while being one of the highest moment as bearing upon the question of corporate policy, is not one which is significant in determining whether or not its addition accomplishes a fundamental change in the character and purposes of the corporation. It is the element of quality rather than of magnitude which is decisive upon that question.

The fact that an increase of stockholders' liability, pursuant to § 3911 of the General Statutes, would attend entering upon the business of generating and selling electricity, would not make the change a fundamental one.

The change would not be converted into a fundamental one for the reason that the prosecution of the newly-authorized business would expose the corporation to taxation upon so much of its property as should be acquired for its conduct, whereas it had been altogether exempt from taxation.

Present limitations upon the liability of the stockholders and tax exemptions do not possess the character of contractual rights of such a nature that the State may not, in the exercise of its reserved power, change them for the protection of the rights of the public or of creditors.

Whatever alteration of a charter may be imposed upon a corporation in the exercise of the reserved power may be offered for acceptance by the majority of the stock.

Where the officers of a corporation make unauthorized expenditures in procuring from the State the proffer of additional charter rights and privileges, the grant is not thereby rendered nugatory and its

Perkins *v.* Coffin.

acceptance by the stockholders will not be enjoined for that reason, since it is as competent for the corporation to directly or indirectly ratify the expenditures as it is for it to accept.

The propriety of future expenditures to secure further legislation in aid of projects purported to be authorized by an accepted charter amendment, if they are proper in themselves, is concurrent with the lawfulness of the corporate purpose in aid of which the legislation is sought.

Argued March 7th—decided May 29th, 1911.

SUIT by minority stockholders to restrain the defendants from calling and holding a meeting of the stockholders of the Connecticut River Company for the purpose of passing upon the question of accepting an amendment of its charter granted by the General Assembly of this State, and from other corporate action, brought to and tried by the Superior Court in Hartford County, *Bennett, J.;* the court sustained a demurrer to the complaint, and rendered judgment for the defendants, from which the plaintiffs appealed. *No error.*

*Lewis Sperry* and *Lucius F. Robinson*, for the appellants (plaintiffs).

*John R. Buck* and *John H. Buck*, for the appellees (defendants).

PRENTICE, J.   The plaintiffs, stockholders in the defendant corporation, The Connecticut River Company, seek a restraining order against it, and against its president and secretary and treasurer.   It appears by the allegations of the complaint, demurred to, that the charter of the corporation, at the time the action was brought, was the resultant of an original grant made in 1824 (1 Private Laws, p. 73), and of amendments thereto, including one made in 1856 (4 Private Laws, p. 1377) and one made in 1881 (9 Special Laws, p. 68).   These resolves of the General Assembly are

set out in full in an exhibit annexed to the complaint. Thus the purposes and objects of the corporation, and the powers and privileges enjoyed by it through grant from the State, as they originally were and have since become, are fully disclosed. They are to be determined by legal construction, to which any allegation thereupon must yield. *Auffmordt* v. *Stevens*, 46 Conn. 411, 413.

The plaintiffs charge that the defendants threaten and intend to ꞓall and hold a stockholders' meeting for the acceptance of an amendment to this charter, which amendment was passed by the General Assembly in 1909, and by its terms was offered to the corporation for acceptance by a majority vote of the stockholders; that the defendant Coffin, president, personally and as trustee, is able to control the action at such meeting of a majority of the stock; and that he threatens and intends to so control it that the vote of such stock shall be cast in favor of the acceptance of said amendment against the vote and protest of the plaintiffs and others, minority stockholders.

It is further alleged in this connection that this amendment, embodied in the complaint, would, if accepted, change the fundamental character and purposes of the corporation, and thus impair the obligation of the contract existing between the plaintiffs and their co-stockholders, change the contractual relation between the plaintiffs and the corporation, its stockholders and creditors, and impair the rights, privileges and immunities which the plaintiffs enjoy under and by virtue of those relations, all in violation of the provisions of paragraph 1, § 10 of Article First of the Federal Constitution. It is also alleged that the acceptance of the amendment would operate to deprive the plaintiffs of their property without due process of law, and to deny to them the equal protection of the

laws, in violation of the Fifth and Fourteenth Amendments of that Constitution.

It is further charged that it is the intention of the defendant president, in the event of the acceptance of the amendment, to have the corporation proceed to build a large and expensive dam across the Connecticut River at Windsor Locks, and to build and operate a large electric power plant and electric transmission system requiring expenditures of very large sums of money, and that the defendant individuals, as officers and agents of the corporation, and the corporation, threaten and intend, in continuance of a policy already inaugurated, to expend large sums of the money of the corporation in the development of an electric power plant, and in attempts to secure further legislation by the General Assembly of this State and by the Congress of the United States to enable it to exercise the powers of an electric power company. In this connection it is also averred that the building, construction and operation of an electric power plant and electric transmission system, and the generation and sale of electricity by the corporation, would "radically change the fundamental character of its corporate business and purposes."

Among the allegations thus referred to are several which embody conclusions of law only. The admissions of the demurrer do not, therefore, run to them, and they may be dismissed save as the facts presented support them. *Coughlin* v. *Knights of Columbus,* 79 Conn. 218, 222, 64 Atl. 223. Such an allegation is that which sets out that the acceptance of the amendment would change the fundamental character and purposes of the corporation. It is a question of law whether or not the amendment, if engrafted upon the charter, would accomplish what the law regards as a fundamental change in the character and purposes of the cor-

poration. 2 Cook on Corporations (6th Ed.) § 499; 1 Thompson on Corporations (1st Ed.) § 85; *New Haven & Derby R. Co.* v. *Chapman,* 38 Conn. 56, 71; *Memphis Branch R. Co.* v. *Sullivan,* 57 Ga. 240; *Witter* v. *Mississippi, O. & R. R. R. Co.,* 20 Ark. 463. As we have before us in the complaint both the existing charter and the proposed amendment, that question is open to our determination, and that determination will supersede any allegation of the complaint. The allegation that the threatened construction and operation would change the fundamental character of the corporate business and purposes, is one of a similar character. Those which charge that the legal result of the threatened acceptance of the amendment would be an invasion of the plaintiffs' rights as guaranteed by the Federal Constitution, are also included in this category of reviewable conclusions of law.

The relief which is asked is two-fold: (1) A temporary and permanent injunction against the defendants restraining them from calling, holding or conducting a meeting of the stockholders of the corporation for the purpose of passing upon the acceptance of the amendment; and (2) a permanent injunction restraining the two defendant officers and their successors in office from "expending any money of the corporation, or obligating the corporation in any way for the purpose of developing an electric power plant and electric transmission system," and against the corporation restraining it from "establishing, building or constructing any electric power plant and from generating, selling or delivering electricity; from the expenditure of any money to secure any legislation either from the General Assembly or from the Congress of the United States for the purpose of aiding in developing an electric power plant, or for the generation, sale or delivery of electricity."

It thus appears that there are two classes of subject-matter of complaint, and two classes of prayers for relief, which are so distinct that considerations which might with propriety be addressed to one might not be pertinent to the other.

The demurrer contains a considerable number of grounds of demurrer. Some of them deal with incidental matters appearing in the complaint, and not yet referred to, or with aspects of the case which are essentially incidental. Others go to the question which underlies the case or its most prominent phase, to wit: as to the power of a majority of stock to effectively accept an alteration or amendment of a charter in opposition to the will of a minority. The court sustained the demurrer upon certain grounds, and refrained from passing upon others which were regarded as not essential to the result reached. We have no occasion to follow the court below in its line of reasoning, or to pass upon the soundness of its special conclusions as disclosed in its memorandum of decision. We have only to inquire whether the demurrer was one which ought to have been sustained, and therefore, whether the court erred in its action in sustaining it, quite regardless of its reasons for so doing. *Lewisohn* v. *Stoddard*, 78 Conn. 575, 589, 63 Atl. 621.

The record discloses that a temporary injunction, as prayed for, was issued *ex parte* when the action was begun, and that the court at the time of final judgment, acting pursuant to the provisions of § 1009 of the General Statutes, and having found that the continuance of such order would work great and irreparable injury, dissolved it. It also appears from a stipulation by counsel that since the judgment below was rendered a stockholders' meeting has been called and held to act upon the acceptance of the amendment, that a majority of the stock voted thereat in favor of such acceptance,

that the plaintiffs voted in the negative, and that a certificate of the action of the meeting was thereupon filed in the office of the secretary of State. The question presented by the record as to the legal correctness of the court's action, in so far as it concerned the holding of a stockholders' meeting to act upon the acceptance of the amendment, was thus deprived of all present practical consequence, and may be dismissed with no further consideration than the observation that its propriety necessarily results from our conclusions upon the other branch of the case.

It is manifest that the burden of the plaintiffs' complaint as to the second branch of the case is, not that the defendants threaten and purpose to perform the recited acts of business conduct, in any event, but only that they threaten and purpose to pursue that course of conduct under the pretended authority of the proposed amendment after its acceptance by a majority vote of the shareowners. The plaintiffs are seeking to test the legality of the latter course of action, and it is that alone which they are attempting to restrain. We understand counsel to concur in this construction of the complaint and its prayers.

It is beyond question that the alleged threatened acts are within the scope of the terms of the amendment. The question before us thus becomes resolved into one as to whether or not the acceptance of the amendment by a majority vote of the outstanding stock, and in opposition to a minority dissent, would suffice to engraft upon the charter powers ample for the performance by the corporation of the acts enumerated and sought to be restrained. It has been discussed by counsel as the broader one, as to whether or not the amendment is one which could be made a part of the charter in its entirety, and as conferring all the powers comprehended by its terms, against the will of a dissenting

minority of stockholders. That is not the inquiry whose answer would necessarily be determinative of the court's action, unless it be that no effect at all could be given to the amendment or to any part of it by a majority acceptance, if full effect as to each and every provision could not be so secured.

The condition last named does not exist with respect to this amendment. It purports to grant a wide variety of powers. These relate to various subjects, and seek the attainment of various objects. There are powers appropriate to the improvement of navigation, to the increase of water-power to be applied to water-wheels, to the provision of water-power for the generation of steam to be applied to the operation of machinery, to the production of such power to be utilized through its conversion into electrical energy for the propulsion of machinery, and to the conversion of electrical energy, first obtained, into light or into heat. It is provided that these various agencies of power, light and heat, when produced, may be utilized directly for the use of the defendant corporation, or be leased or sold to others for use. There are provisions as to the delivery of these agencies to purchasers or lessees, and as to territory, and a wide variety of regulations and recitals of powers in incidental details. This hasty resumé indicates that the powers attempted to be conferred are clearly separable both as to subject, object, and otherwise, and that the various provisions are by no means mutually connected or dependent upon each other. There are powers applicable to several different and quite distinct subjects, and certain of these classes of powers are separable in respect to the extent to which and the conditions under which they may be exercised. Counsel for the plaintiffs well say that the amendment could not be dissected, and accepted in part. It could only be accepted as offered by the State. But it does

not follow from this that, if it be accepted in form in its entirety, no portion of its provisions could be held operative if any separable and independent portion could not be.    Neither does it follow that if the engrafting upon the charter of some separable portion of the amendment by the assent of a majority only of the stock is forbidden by law, that no part of it could be effectively so engrafted by majority action in the only permissible way, to wit: by the acceptance of the whole. As to separable and independent matters, not mutually connected and dependent upon each other, the amendment might well become effective as to a portion or portions of the attempted grant of powers by majority action, although such action was inadequate to give effectiveness to other portions.    *State* v. *Wheeler,* 25 Conn. 290, 299; *Wilcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 53, 29 Sup. Ct. Rep. 192; *Employers Liability Cases,* 207 U. S. 463, 501, 28 Sup. Ct. Rep. 141.    The question for our determination is, therefore, the narrower one first stated.

In this connection it is well to recall what it is that, as alleged, the defendants threaten and purpose to do under the assumed authority of the amendment, if accepted by a majority vote, and what the court is asked to enjoin.    It is, taking up the matters enumerated in the complaint in the order of their recital, the building of a large and expensive dam across the Connecticut River, the building and operation of a large electric power plant and electric transmission system requiring the expenditure of very large sums of money, and necessitating a large indebtedness and large bond issue, and the expenditure of large sums in the development of an electric power plant, and in attempts to secure additional legislation to enable the company to exercise the powers of an electric power company.    The acts which it is sought to enjoin are the expenditure of

money and the creation of financial obligations by the company for the purpose of developing an electric power plant and electric transmission system, the construction of an electric power plant, the generation, sale or delivery by the company of electricity, and the expenditure of money to secure legislation for the purpose of aiding in the development of an electric power plant, or for the generation, sale or delivery of electricity.

An analysis of these subjects of complaint and prayer shows that the things which it is asserted that the defendants have it in contemplation to do upon the acceptance of the amendment by a majority of the stock, and which it is desired to restrain, consist of those acts, and of those only, which are involved in the construction and development of an electric power plant and electric transmission system, and in connection therewith the generation, sale and delivery of electricity. Here is the description of a single, complete and independent business with its associated distinctive features. It is a business which is not only distinctive in character from others within the purview of the terms of the amendment, but those provisions of the amendment which are appropriate to this business may readily be disassociated from those which touch upon other matters. It possesses all the requisites of separability, and may, therefore, be treated by itself and uncomplicated by considerations which might be addressed to other unconnected features of the amendment.

Language is used characterizing the proposed plant as a large and expensive one, and the projected enterprise as one requiring the expenditure of large sums, and involving large financial obligations and hazards. We may with profit reserve these incidental allegations, and others of a similar character contained in the complaint, for later consideration when the nature of the issue before us shall have been more fully developed.

The language of the amendment forbids any claim that it could become operative without corporate action. See § 9. Its contents as effectually forbid a claim that its provisions might have been imposed upon the corporation in the exercise of the State's reserved power of alteration, amendment or repeal, did such power exist. Our question, therefore, is not one which involves an inquiry as to the extent of the reserved power, but as to the power of the majority stock in the matter of an acceptance of a proffered charter amendment. While the ultimate answer to be given to this question might not be different according as the charter was an open or close one, it will serve to facilitate our discussion, if its character in that regard be first established.

The charter, when originally granted, was unquestionably a close one. No reservation of a power of alteration, amendment or repeal was contained in it. *Dartmouth College* v. *Woodward,* 4 Wheat. (U. S.) 518. The amendment of 1856 was made at the request of the corporation embodied in a vote passed at an annual meeting, and the corporation has availed itself of its provisions, and in such a manner as necessarily to have become known to every stockholder, from the time of its passage down to the present. The consequence of this action has been the opening of the charter. General Statutes, § 3315. True there has been no formal stockholders' vote accepting the amendment, and, of course, no copy of such vote has ever been filed with the secretary of State. But it is a too literal construction of the statute which would permit the corporation as against the State to say that there had been no acceptance, or that the corporation, by refraining from a particular manner of acceptance which the statute directed, had succeeded in retaining the right which it would have lost had it secured in the prescribed way the results

which it has enjoyed for more than half a century. Acceptance will be implied from the exercise of the powers granted. *Gibbs* v. *Consolidated Gas Co.*, 130 U. S. 396, 9 Sup. Ct. Rep. 553.

With respect to alterations of charters which the sovereign may not at its will impose upon the corporation, the well-settled rule is that those which work a material or fundamental change will not become operative unless accepted or assented to by all of the stockholders; while those which make auxiliary or incidental changes only may become engrafted upon the charter by the acceptance of a majority. The right of the majority to rule in all matters relating to the corporate business and policy within the authority of the charter, and in respect to any changes in that charter which the law regards as auxiliary or incidental to its existing plan, purpose and character, is one which is implied in the contract into which the stockholders enter, and in such rule against a dissenting minority there is no violation of that contract, or impairment of its obligations. *New Haven & Derby R. Co.* v. *Chapman*, 38 Conn. 56, 71; *Joy* v. *Jackson & M. P. R. Co.*, 11 Mich. 155, 171; 1 Clark & Marshall on Corporations, p. 171, § 57e.

The test to determine the limit of the power of the majority stock in the defendant corporation being furnished, the question remains as to what changes are to be regarded as fundamental and material and what auxiliary or incidental. By common consent no exact formula for the determination of the line of demarcation between the two classes of changes under all conditions can be furnished. Statements explanatory of the distinction intended have, however, frequently been made. The following are among the most helpful of them. "An amendment may be said to be auxiliary and incidental when it merely grants new powers or authorizes new methods and new plans for the purpose of carrying

out the original plan and effecting the real object of that plan." 2 Cook on Corporations (6th Ed.) § 499. "Amendments, which do not change the nature, purpose, or character of a corporation or its enterprise, but which are designed to enable the corporation to conduct its authorized business with greater facility, more beneficially, or more wisely, are *auxiliary* to the original object." *Mower* v. *Stables*, 32 Minn. 284, 286, 20 N. W. 225. "Where there is an exercise of the power in good faith, which does not change the essential character of the business, but authorizes its extension upon a modified plan, both reason and authority support the corporation in the exercise of the right." *Wright* v. *Minnesota Mutual Life Ins. Co.*, 193 U. S. 657, 664, 24 Sup. Ct. Rep. 549. "However, it may be stated as a general rule that alterations or amendments which materially change the nature and purposes of the corporation, or the undertaking or business venture, for the prosecution of which it was created, are regarded as fundamental and material." 1 Thompson on Corporations (2d Ed.) § 374. "The majority may bind the minority by accepting an alteration or amendment which does not radically or fundamentally change the character or objects of the corporation, but is merely in furtherance of the objects for which the corporation was created." 3 Clark & Marshall on Corporations, p. 1904.

Little light will be thrown upon the practical scope of these principles by an analysis of the results which have been reached in attempts to apply them to concrete cases. The cases in which this has been undertaken are very numerous, and they exhibit such a wide difference in results reached that one may draw from some of them inferences by way of analogy which would tend to support almost any position. In fact it will be found that different conclusions have been arrived at upon substantially similar conditions. This confusion in the

cases has been the subject of frequent comment, so that it has been often said that each case must be left for determination upon its own peculiar facts. 2 Cook on Corporations (6th Ed.) § 499; *Wright* v. *Minnesota Mutual Life Ins. Co.*, 193 U. S. 657, 663, 24 Sup. Ct. Rep. 549. The case before us can, therefore, be satisfactorily answered only by an application of the conceded test to the conditions presented by the record.

An examination of the original charter discloses that it, unlike many such enactments, had in view a large public purpose to be accomplished through its operation. That purpose, from the point of view of the State, was doubtless its main and underlying one. It was the improvement, through the agency of private capital and enterprise, of boat navigation of the Connecticut River at and near the Enfield Falls. In order to thus secure this beneficial public result it was necessary not only to grant to the corporation the powers required for the accomplishment of the improvements, but also to bestow upon the corporation such privileges and franchises as would induce the enlistment of private capital in the enterprise. These privileges and franchises and the means of their enjoyment must be regarded as within the main design of the charter, and as much a part of its plan and purpose and of the general enterprise as any other features of it. The powers conferred, as bearing peculiarly upon the public end in view, included the erection of dams, the building of locks, the construction of a canal on either bank of the river, and the improvement of the channel of the river from Hartford to Springfield in Massachusetts. The privileges conferred embraced the right to build wharves and piers along the river banks, the right to procure and possess any boats, steam or other, which might be thought necessary to increase the commerce of the

river, and the right to collect prescribed tolls from boats and rafts passing up or down the stream.

This enumeration indicates somewhat the wide scope and diversified character of the grants of power and privilege which were included in the plan of this charter in order to secure the accomplishment of the public purpose contemplated by it. But that is not all. The grant of the power to collect tolls, which is expressed in § 10, is followed by another of far reaching possibilities in § 11, where it is provided that the corporation "may also purchase and hold such mill or mill seat or manufactories upon or adjacent to Enfield falls as they may judge expedient, and the same may lease or alien, by lease or deed, . . . in such way and manner as said corporation shall direct." 1 Private Laws, p. 76.

We may not say which one of these privileges presented the most alluring prospect to investors eighty-seven years ago. Perhaps it was the right to the tolls, as the plaintiffs urge, and perhaps it was not. Who shall say from this barren record that there was not some forecast in the mind of those who became associated in the enterprise, of the possibilities lying within the broad provisions of § 11 under the conditions to be created by the contemplated improvements, such as we know have been elsewhere realized under quite similar conditions? Unfortunately we do not have before us either an adequate picture of what those conditions would be, or the story of what the succeeding years have brought to pass in the neighborhood of Enfield Falls, to aid us in arriving at a conclusion as to what may have entered into the minds of these persons. We may not use our personal knowledge upon this subject, although it be a matter of large notoriety, and can only take the language of the several grants at its face value. So taking it, and reading it in the light of what it was proposed to do upon the river, it is plain to

see that there lay in these provisions of § 11 large pos-
sibilities of industrial enterprise, and of enterprise of
extensive proportions, which might have appealed to
an investor.   The corporation was privileged to pur-
chase and hold mills, mill sites and manufactories,
without limitation as to location or extent save that
they be adjacent to the Falls.   It might hold, sell, or
lease them at will.   This power carried with it by the
plainest implication the power to utilize for the opera-
tion of these mills and factories, so owned, sold or
leased, the latent energies in the fall of the waters of
the river, subjected to the control of the corporation as
the charter contemplated, or in the waters of the canals
to be dug, and to sell that power to lessees or owners.
The intimate association between the power there
present and to be put in a condition convenient for
use, and the mills which might be there erected, is too
apparent to permit any other conclusion.   The amend-
ment of 1881 recognizes this in its provisions for the
preservation and maintenance of the company's "water-
power."

Doubtless the early notion as to the method by
which this latent power would be made useful was by
the direct application of the water in its fall to the old
time water-wheel.   But the company was not, for that
reason, limited in the furtherance of its purposes and
objects to that peculiar method of accomplishing the
same desired result by the same ultimate potential
agency, at the risk of making a fundamental change in
its enterprise, plan or essential character.   Different,
if not more advantageous and beneficial, methods for
the utilization of water-power have resulted from later
invention and discovery.   Among them is that of har-
nessing the latent energy in the falling water to machin-
ery so as to energize it by a process which involves its
conversion into electricity.   In this there is only a

change of method and the use of a different medium. The same thing is applied to accomplish the same end. Certainly a corporation endowed with the power of achieving a given result by the action of a given agency, may be permitted to change the method of employing that agency in the achievement of that result so as to keep pace with the advance of science and invention, and thus accomplish its purpose most advantageously, without affecting a fundamental change in its essential character, purpose or objects, or in its general plan or enterprise. To say otherwise, and thus bind the corporation to past methods without the unanimous consent of stockholders, would be to prepare the way for what might easily be made its doom.

It is common knowledge that the appropriation of water-power from the running stream involves constructions to control in some manner the water flow, and that the utilization of such power through the medium of electricity involves a plant for the generation of the electricity and a transmission system to carry it, when generated, to the point of use. Should this corporation, therefore, make such constructions, build such a plant and install such a transmission system for the purpose of generating electrical energy from the latent water-power at its command and of transmitting it for useful application, and either itself use such energy for its own power purposes, or sell or deliver it to others for such use, and enter upon such course of action as a distinctive feature of its business enterprise, it would not be making a fundamental or material change in the character, purposes or objects for which it was created, and, therefore, one which could not, under the principles stated, be authorized except by the assent of all the stockholders.

The alleged fact that the projected constructions and plant are to be large and costly, and the enterprise

one which will require the expenditure of large sums, the employment of large capital not now possessed by the company, will entail the creation of heavy financial obligations, burdens and hazards, and may result in the destruction of the present value of the stock, are considerations of the highest moment as bearing upon the question of corporate policy, and as addressed to the stockholders in determining that policy. In such matters, however, the judgment of the majority, whether wise or unwise, must govern. But as touching the question of the acceptance of proffered corporate authority, the test to be applied, as we have seen, is one which looks to the quality and character of the new in relation to the old, and not to the element of magnitude whether in connection with extent of business, capital required, or financial risks incurred.

We have no occasion in this connection to inquire whether or not acts in the prosecution of the business of generating, selling and delivering electricity in some manner, for some purpose or to some point or points within the terms of the amendment might not conceivably be attempted, which, if permitted, would result in a fundamental change in the corporation. The complaint contains no allegations calling for any such inquiry. What it complains of and seeks to have enjoined is the adoption of the general line of business stated, as such. It is wholly barren of suggestion that any act is intended which would not be appropriate to the natural and normal conduct of that business as a substantial feature of the corporate enterprise, or that it is proposed that the corporation carry on that business in some way, for some purpose or within some territory, so that conditions would thereby be created calling for special consideration. What the plaintiffs complain of does not relate in any respect to the manner of carrying on the business, but to the carrying

on of it at all. That complaint is not well founded, and we have no occasion to inquire whether or not the company might not conceivably undertake to do something in the line of the generation and transmission of electricity for power purposes which the law would regard as obnoxious to the test to be applied.

The plaintiffs in their complaint aver in aid of their contention and prayers that the entrance of the defendant upon the business which we have been discussing would bring it under the operation of § 3911 of the General Statutes, with the result that the liability of each stockholder would be increased, in that he would become personally liable to the creditors of the company to the extent of twenty-five per cent of his holdings. This again is a matter for consideration as bearing upon the business policy of the company, and thus presents a question for majority decision. But it has no significance in determining whether or not the proposed new enterprise involves a change of corporate plan and purpose, or is one in furtherance of the existing plan and purpose by the employment of new methods. The test to be applied in determining whether a fundamental change would result does not have regard for matters like this. It is also worthy of note that whatever limitation of liability the defendant corporation's stockholders may now enjoy, that limitation does not enter into the contract between the State and the corporation, the State and them, or the corporation and them, so that the State may not in the exercise of its reserved power change it for the protection of the rights of the public or of creditors. *Looker* v. *Maynard*, 179 U. S. 46, 52, 21 Sup. Ct. Rep. 21; *Sherman* v. *Smith*, 1 Black (66 U. S.) 587; *Commissioners* v. *Holyoke Water Power Co.*, 104 Mass. 446, 451; *In re Lee & Co.'s Bank*, 21 N. Y. 9, 22. Any existing limitation is, therefore, one of the incidents of the corporate

being which exists only at the pleasure of the State, and does not partake of a distinctive feature which may not be altered without causing a fundamental change in the objects and purposes of the being, and without the assent of all the stockholders. Whatever alteration of a charter may be imposed upon a corporation in the exercise of the reserved power may be offered to it for acceptance by the majority. 2 Morawetz on Corporations (2d Ed.) § 1111.

The National Banking Act furnishes a striking illustration in point. That Act (U. S. Rev. Stat. Comp. 1901, § 5154), long in force, authorizes two thirds of the stockholders of a State bank to effectually incorporate it as a national bank, and by virtue of such incorporation to subject the stockholders to liability for the debts of the bank to an amount equal to the par value of their several holdings in addition to their investment. § 5151. Certain States have adopted legislation in aid of dissenting stockholders, but we are not aware of the constitutionality of the national act having been successfully challenged, or for that matter challenged at all, save in one case where it was upheld. *Keyser* v. *Hitz*, 13 Mackey (D. C.) 473. See also *State* v. *Phœnix Bank*, 34 Conn. 205, 237; *Casey* v. *Galli*, 94 U. S. 673.

The complaint also presents, as a reason why the desired restraining orders should issue, the fact that by the terms of the amendment (15 Special Laws, p. 777, § 9) the prosecution of the proposed business would expose the company to taxation upon so much of its property as should be acquired for its conduct, whereas it is now altogether exempt from taxation. The burden of taxation is one usually incident to property acquisition and holding. The amendment undertakes nothing more than to attach that incident to the acquisitions of this company made for the new

enterprise. It does not profess to diminish the exemption now enjoyed. The argument which would deprive the majority of the privilege of entering upon the proposed business because to do so would carry with it the burden of taxation, would ordinarily result in depriving the majority of its control in respect of all matters of corporate acquisition or expansion. Even had the amendment gone further than it did in the line of submitting to taxation the property of the company, that fact would have furnished no obstacle to the acceptance of the amendment as proposed, for reasons substantially similar to those outlined concerning the extension of personal liability. See as to the reserved power in the matter of taxation, *Union Passenger Ry. Co.* v. *Philadelphia,* 101 U. S. 528; *Tomlinson* v. *Jessup,* 15 Wall. (U. S.) 454; *Deposit Bank* v. *Daviess Co.,* 102 Ky. 174, 39 S. W. 1030, approved 173 U. S. 662, 19 Sup. Ct. Rep. 875.

The allegations of past unauthorized and unlawful expenditures of the moneys of the corporation by the defendant officers in securing the grant of the amendment and Federal legislation in aid of it, and otherwise in furthering by anticipation the project in view, have no other pertinence to the prayers than to give color to the allegations of threatened future expenditure in the same line, unless it be contended that such past expenditure would invalidate the entire proceeding, and prevent any legal result from the acceptance of the amendment. Such a contention would have no foundation. The majority having power to accept, would have co-extensive power to adopt and ratify the antecedent expenditure either by the act of acceptance or otherwise by subsequent action.

As far as expenditures to secure additional legislation in aid of the projected enterprise are threatened to be made in the future upon the acceptance of the amend-

ment by a majority, the propriety of them, in so far as they are reasonable and lawful in themselves, is concurrent with the propriety of the purpose in aid of which the legislation is sought. The general prayer to restrain them must, therefore, be denied.

There is no error.

In this opinion HALL, C. J., THAYER and RORABACK, Js., concurred.

WHEELER, J. (dissenting). This action seeks to restrain the Connecticut River Company from accepting an amendment to its charter enacted in 1909, and from exercising the powers conferred by that amendment. The stipulation of counsel, that the amendment has in fact been accepted, relieves the court from the necessity of deciding whether an order restraining the company from accepting this amendment should issue.

I agree with the opinion of the court: "The charter, when originally granted, was unquestionably a close one. No reservation of a power of alteration, amendment or repeal was contained in it." Unless the plaintiff stockholders have given up their contract right under this charter, it was not open to amendment, and the plaintiffs are entitled to the relief prayed for in case authority for the acts complained of cannot be found in the original charter.

It is said the amendment to its charter in 1856, changing the date of its annual meeting, opened the charter under the provisions of General Statutes, § 3315, which in its present form has been in force since 1845, viz.: "When any amendment or alteration of the charter of any corporation shall be made, if it be not otherwise specially provided in the resolution making such alteration or amendment, it shall not become operative, unless within six months after its passage it shall be ac-

cepted at a meeting of such corporation, legally warned for that purpose, nor unless, within said period, an attested copy of said acceptance shall be filed in the office of the secretary of State, to be recorded by him in a book kept for that purpose; and such acceptance shall make the original charter, and all resolutions amending and altering the same, subject to amendment, alteration, and repeal, at the pleasure of the general assembly." The amendment of 1856 was never in fact "accepted at a meeting of the corporation," and no attested copy of said acceptance was filed in the office of the secretary of State. The company held its annual meetings at the date named in the amendment ever since its passage, and the court holds that this course of conduct constituted an acceptance. The statute, in my view, makes these acts to be performed within six months conditions precedent to the operation of the amendment. I have been directed to no rule of construction which permits a statutory power, expressed in definite and precise terms, to be disregarded and controlled by the acts of a party affected by it. We held in *Hartford & C. W. R. Co.* v. *Wagner*, 73 Conn. 506, 509, 48 Atl. 218, under General Statutes, Rev. 1888, § 1911, now § 3315, that an amendment to its charter giving a corporation the right to condemn land must be accepted by proper vote and a copy lodged in the office of the secretary of State, "since otherwise the power would not have been given." Acceptance will be implied from the exercise of the powers granted, provided there be no statutory prohibition forbidding this. When it was provided that the amendment "shall not become operative" unless certain things were done within six months, the failure to fulfil these conditions rendered the amendment nugatory. The court does not hold or suggest that the 1881 amendment opened this charter, and we presume for this reason.

The amendment of 1881, which was duly accepted, recites (§ 3): "but this resolution may be amended or repealed at the pleasure of the general assembly, but such amendment or repeal shall not affect the rights, liabilities, obligations, or immunities of said corporation under its original charter"; thus the amendment clearly preserves all of the rights under the charter, one of which was the constitutional right of freedom from amendment, and this reservation constituted a recognition by the general assembly that the charter was not subject to amendment under § 3315. When the amendment of 1909 was enacted the charter was not open to amendment, and dissentient stockholders are entitled to restrain the company from the exercise of any of the powers conferred by such amendment and not contained in the charter. The inference that this charter became an open charter upon the acceptance, by user, of the amendment of 1856, is one which ought not to be lightly made. The charter gave this company valuable privileges and an exemption from taxation. We may assume that this company never intentionally parted with this exemption for an amendment merely changing the date of the annual meeting. The value of this exemption helps us to understand the legislative meaning in the amendment of 1881, in the language quoted and in the similar language used in the amendment of 1909. These are recognitions that this charter was not open to amendment, and the 1909 amendment was an attempt to preserve its rights thereunder.

The court construes this complaint as limited to an assertion of those acts which it is desired to restrain which are involved in the construction and development of an electric power plant and electric transmission system, and it decides that these have relation solely to the generation, delivery and sale of electric power, and, while it does not particularize, it makes inevitable the

inference that it does not consider the complaint to allege that this company intends to engage in the electric lighting or heating business, both of which are within the scope of the amendment.

Confining the complaint to electric power alone is too narrow a construction, and neither does justice to the intent of the pleader nor to the manifest desire of both parties to secure an adjudication of the questions argued. In their demurrer the defendants treated the complaint as containing allegations relating to electric lighting. The case was presented to this court from this standpoint and no suggestion was made that the case should be confined to the electric power business. This limited construction of the complaint will in all likelihood compel the plaintiffs to bring another action in order to have their rights fully adjudicated,—a result to be avoided if possible in justice to all the parties in interest.

Space permits only a reference to a part of the allegations of the complaint. The amendment of 1909 authorized the company to manufacture, generate and produce electricity and electric power for the purposes of power, light and heat, and granted to it in broadest terms all the powers necessary to enable it to effectuate these purposes. The company accepted this amendment. It has already incurred an indebtedness of large proportions for the purposes of the development of an electric light and power plant. It intends to construct and operate an electric power plant and transmission system, and this, and the generation and sale of electricity, would convert this company into an electric light and power company.

The pleader might have used language of clearer import, but his intent seems to me unmistakable. The term "electric transmission system" has a technical meaning of broad significance. One of the standard

authorities says: "The subject of power transmission is a very broad one: dealing with the transmission and distribution of electrical energy as generated by the dynamo or alternating current generator to the receiver" which may be lamps, motors, etc.

By "electric transmission system," taken in connection with the allegation that the company had expended its funds to develop an electric light and power company and that its construction and operation of an electric power plant and electric transmission system would convert the company into an electric light and power company, the pleader intended the use of a general term for the conveyance of electricity generated in the electric power plant and for the purpose of supplying power and light under its amendment.

The whole of the complaint should be read together, and in the liberal spirit of our Practice Act the language relied upon by the court, "electric power plant and electric transmission system," "should be accorded such reasonable construction as would give effect to the pleading with reference to the general theory upon which it proceeded and do substantial justice between the parties." So viewed, the complaint alleges acts which indicate that the company purposes to engage in the electric lighting as well as the electric power business.

The injunction prayed for would prevent the establishing or constructing of any electric power plant for any purpose and the generating, selling or delivering of electricity for any purpose. It may be that the restraint prayed for is broader than the facts alleged justify, but that they justify some order of restraint. If this be true under the relief prayed for, such order must be issued.

I need not pursue the discussion of this point; in my view there is no legitimate distinction to be drawn

between the electric lighting and the electric power business, so far as the authority under this amendment to conduct them is concerned.

If the amendment of 1856 can be held to have been accepted through the exercise by the company of the powers it gave, and the charter thereafter became subject to amendment, the law allowed amendments which were incidental and auxiliary to the powers granted by the charter and forbade amendments which materially and fundamentally change the charter and thereby violate the contract rights of the stockholder. The stockholder may waive the violation or enforce his contract rights. The State may authorize a corporation to alter its original enterprise and exercise new franchises, but these it may not do against the will of a single stockholder.

If the amendment of 1909 be a material and fundamental change, the right of these plaintiffs to an injunction is unchallenged. What will constitute a material and fundamental change is difficult of definition. An amendment which materially changes the scope of the business of the corporation or its business risk is a fundamental and material change. 1 Thompson on Corporations (2d Ed.) § 374.

Let us apply to this case these two conditions. Does this amendment materially change the scope of the corporation, or does it materially change its business risk? Let us ascertain in the first place the scope of the original charter.

The Connecticut River Company was incorporated in 1824, for the purpose of improving the boat navigation of the Connecticut River, and given power to widen and improve the channel of the river from Hartford to Springfield, and to erect wharves and piers in said river or on its branches; to build locks at the falls at Enfield; to construct a canal on either bank near said falls and to

construct a dam or dams for the purpose of entering and leaving the locks in still water; to procure and possess any steamboat or boats to increase commerce on said river, and to charge toll for all boats passing up or down said river over or through said falls.

Section 11 of the charter provided that "the said corporation may purchase and hold so much real estate for making said locks, canal and dams as may be necessary or convenient, and may also purchase and hold such mill or mill seat or manufactories upon or adjacent to Enfield falls as they may judge expedient, and the same may lease or alien, by lease or deed," etc. From this power to hold and purchase "mill or mill seat or manufactories" the court holds that the right to supply them with water-power must be implied. A trial would have placed the court in better position to know whether such power is implied in this language than can be known upon a hearing on demurrer; but the facts of history as well as contemporaneous enactments we may take judicial notice of, and they furnish some light. 16 Cyc. 869; *Arthur* v. *Norfield Congregational Church,* 73 Conn. 718, 731, 49 Atl. 241; *Taylor* v. *Barclay,* 2 Simons 213, 222; *State* v. *South Norwalk,* 77 Conn. 257, 261, 58 Atl. 759; *Smith* v. *Speed,* 50 Ala. 276, 279.

Hartford business men organized the Connecticut River Company in order to compete with New Haven business men who had organized the Farmington Canal Company to secure the business of the river towns of the Connecticut valley. By a canal it was intended to avoid the long land carriage around the Enfield Falls. The undertaking proved a difficult one for the men of that day to finance, and the project was saved by the organization of The Connecticut River Banking Company for the purpose, primarily, of furnishing aid to the River Company. The building of the dam and the canal destroyed the water-power of one or more mills, and

§ 11 gave the company power to take over such concerns and lease or alien them.

After the canal was opened on November 11th, 1829, one line, and part of the time two lines, of steamboats operated between Hartford and Springfield until the advent of the railroad in 1846 destroyed shipping business on this part of the Connecticut. After its charter was granted the projectors of the company saw possibilities of utilizing the water-power and building up a manufacturing village in Windsor at the foot of the locks, hence the name Windsor Locks. Thereafter the company began to utilize the water-power for the operation of manufactories. That use has admittedly continued to the present time. The business was of great public utility and is responsible for the town of Windsor Locks and its manufactories.

Under such circumstances the State had no interest to question the exercise of an ungranted power, and the stockholders' interest, seeing a business of growing possibilities taking the place of the decadent steamboat and the lost tolls, was not heard to complain.

In the amendment to its charter, passed in 1881, the General Assembly stated one of the purposes of the amendment to be "to preserve and maintain the water-power of said company." This I think is such a recognition of this long use of the water-power in the conduct of its business, as to have made the right to such use a practical part of its charter, although not in the original charter.

Whatever powers this section confers over mills or mill seats or manufactories, must be exercised "upon or adjacent to Enfield falls," and not elsewhere in the towns of Windsor Locks and Suffield or the county of Hartford, as attempted to be conferred by the proposed amendment. Further, the authority to purchase and hold such mills or mill seats or manufactories does not

confer the power to operate; in express terms the statute limits its power over these to its right to lease or alien. Had the intent of the General Assembly been to permit the company to operate manufactories there would necessarily have been included in this provision the right to operate any kind of a manufactory. That is, in this very general language would have been found the power to engage in any form of manufacturing. We have seen that the purpose of the charter did not contemplate this. Its projectors claimed no such power any more than those who conduct its present business claim it.

The State has never conceived that canal companies of this character were manufacturing companies; thus we find in the classification of the Private Acts of 1789 to 1836, published by authority of the State in 1837, this and other canal companies are placed in a separate class and not in the manufacturing class.

The policy of the State, as evidenced by all charters of manufacturing companies granted before and after 1824, was to state in the charter the purpose of the company, and to confine it to certain specified kinds of manufacturing. An omnibus charter permitting a corporation to engage in any and all forms of manufacturing was unknown in that day, and this affords most cogent reason that no departure was made therefrom in this instance.

In late years very broad charters have been granted by the General Assembly, but none, I believe, which purport to give a corporation power to embark in every form of manufacturing. Such charters contain restrictions which are absent from this charter. The terms of the Act are absolutely silent as to any such purpose, nor is there language which by reasonable implication admits of such power.

As we said in *Southington* v. *Southington Water Co.,* 80 Conn. 646, 658, 69 Atl. 1023: "We are bound to

assume, for all that here appears, that the words used in the resolution enacted were used in their accustomed and approved sense, and that, if some other meaning was intended, some other appropriate expression would have been employed."

The record does not tell us whether this or any other canal company of the State ever undertook to manufacture a commodity for trade. I have not felt at liberty to take judicial notice of what local history may say of this. The trial would have presented the fact, and a practical construction put upon this charter is high evidence of what the charter is, and if it were established that neither this nor any other canal company had ever engaged in the manufacturing business it would indicate a State policy which a court would have no right to assume was abandoned in enacting this charter. *New Haven and Fairfield Counties* v. *Milford*, 64 Conn. 568, 574, 30 Atl. 768; *Geer* v. *Rockwell*, 65 Conn. 316, 323, 32 Atl. 924. Were this grant subject to two constructions, that is to be adopted which is most favorable to the State and against the company. *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 Conn. 210, 222; *Bradley* v. *New York & N. H. R. Co.*, 21 id. 294, 306; *Geer* v. *Rockwell*, 65 id. 316, 323, 32 Atl. 924; *Stourbridge Canal* v. *Wheeley*, 2 Barn. & Adol. 793.

Since, then, this charter gave no power to engage in the manufacturing business, the next inquiry is whether the generation of electricity for power and light for sale is manufacturing. What electricity is we do not know. But we know that mechanical energy developed by the steam engine or by water-power may be at its source converted into electrical energy by machinery, devices and apparatus discovered by man. We know that this process of conversion is purely artificial, and that the electrical energy so generated may by further artificial devices be controlled, measured and liberated

at will to do the service of mankind. Until apparatus was invented for transmitting this electrical energy to the point of use, it was unavailable for business purposes. Until a motor similar in construction to the generator but operating the reverse of it was invented which transformed at the point of use the electrical energy back into mechanical energy, it was unavailable for the operation of machinery in any form of industry. Until devices were invented to convert the electrical energy at the point of use into light, the great business of electric lighting could not exist.

The development of a business for furnishing power, or power and light, requires the expenditure of a large sum of money for building, plant, machinery and apparatus. The process by which this electrical energy is developed is the joint product of the brains, the capital and the labor of man. The process through which a new quality or use is given to the raw material of nature by the labor and savings of man, or by his inventive genius applied through the agency of machinery in combination with these so that it becomes the vendible commodity of a great business, is manufacturing.

Of the many charters granted electric light and power companies in this State with few exceptions the purpose is expressed to be "to manufacture, use and sell," or "to produce, generate and manufacture," or "to manufacture, use, rent and sell," or "to generate, manufacture and sell," or "to manufacture, generate, produce, sell, buy and lease;" but whatever the collocation of words expressive of the purpose, we find the word "manufacture" used. In the amendment of 1909 the purpose is stated to be "to manufacture, generate, and produce electricity and electric power for the purposes of power, light, and heat."

So we see the General Assembly has since 1881, the earliest year of the electric light and power company

charters in Connecticut, regarded the generation of electricity by such companies as manufacturing, and this use of the term likewise indicates that expert opinion has regarded this as a proper designation for the process. We find a similar use of the term "manufacture" in the charters of like character in other jurisdictions. Our court in *Norwich Gas & Electric Co.* v. *Norwich,* 76 Conn. 565, 569, 577, 57 Atl. 746, in construing a statute referring to the manufacture of electricity, uses as one of its illustrations that of a manufacturer. Judicial opinion has pointed out that the word *manufacture* has long since lost its derivative meaning, and with the advance of science and art come to mean "anything made by art or skill." *Commonwealth* v. *Northern Elec. L. & P. Co.,* 145 Pa. St. 105, 116, 22 Atl. 839; *Carlin* v. *Western Assurance Co.,* 57 Md. 515, 526. When courts have been called upon to determine whether the generation of electricity was manufacturing, they have generally so held it to be. In *People ex rel. B. E. M. Co.* v. *Wemple,* 129 N. Y. 544, 29 N. E. 808, the issue was whether the relator, an electric light company, was a manufacturing corporation and exempt from taxation under the statute, and the court held that the generation of electricity in the business of an electric light company was manufacturing and the company within the exemption. In a similar case, *Commonwealth* v. *Northern Elec. L. & P. Co.,* 145 Pa. St. 105, 22 Atl. 839, the court held the company not within the exemption by reason of the terms of the statute, although agreeing with the New York Court of Appeals in holding that such corporations were in fact engaged in manufacturing. *Southern Elec. L. & P. Co.* v. *Philadelphia,* 191 Pa. St. 170, 172, 43 Atl. 123. In *Lamborn* v. *Bell,* 18 Colo. 346, 350, 32 Pac. 989, the Constitution of Colorado gave the right of eminent domain for milling purposes. The court held milling

included manufacturing, and that an electric light company was a manufacturing company and therefore a right of way for a ditch to convey water to an electric light plant might be condemned. *Salt Lake City* v. *Salt Lake City W. & E. P. Co.*, 25 Utah 456, 467, 71 Pac. 1069. The manufacture of electricity has been likened by the courts to the manufacture of artificial gas (*Nassau Gas Light Co.* v. *Brooklyn*, 89 N. Y. 409; *Emerson* v. *Commonwealth*, 108 Pa. St. 111), and of artificial ice (*People* v. *Knickerbocker Ice Co.*, 99 N. Y. 181, 1 N. E. 669), and distinguished from the collection and distribution of natural gas and ice, which is the mere appropriation of a property of nature and not an artificial product resulting from machinery devised and directed by human skill and labor whose manufacture develops a new business by the wise use of capital combined with human foresight and energy. There is no need to show that the development of mechanical energy by water-power is not manufacturing. So far as I am aware such claim has never been made, nor could it be successfully made. If the proposition that the charter of 1824, up to the amendment of 1909, gave this company no power to engage in the business of manufacturing in any form, be sound, and the generation of electricity for use in the business of selling power and light is manufacturing, it would seem to follow as a corollary that a business foreign to its charter was beyond the corporate powers of this company, and constituted a material and fundamental change in its business character.

The terms of this amendment point clearly to its primary purpose,—the business of generating electricity for power, light and heat. All else in the amendment is subservient to this.

The admission in argument of counsel for the respondent, that this amendment, the free gift of the State, because of these very powers, is worth $100,000

to this company, is conclusive evidence of this purpose.

We have seen that this company was organized to improve boat navigation of the Connecticut River, and by user followed by legislative recognition, its charter powers were extended to include the sale of water-power upon or adjacent to Enfield Falls. The amendment of 1909 describes in detail the uses to which the electricity generated may be put. It may use it in its own business. It may sell or lease it to any manufacturing or business establishments located between said canal and river. It may sell or lease it to any of its tenants or lessees within the towns of Windsor Locks and Suffield for use on said leased premises. It may sell or lease electricity to any other manufacturing or business establishments in the towns of Windsor Locks and Suffield in quantities not less than fifty horse power. It may sell and deliver said electric power, light and heat, to electric companies and electric light and power companies duly authorized in any town, city or borough within the county of Hartford, and to any railroad company or street-railway company having any part of its lines within said county. It may deliver electricity in any town, city or borough in said county, either overhead or underground, and through public streets, ways and public grounds, first having secured permission from local authority. It may convey power, light and heat to electric companies and electric light and power companies in any city in said county upon the same terms as to location of lines, poles and conduits as are applicable to such companies in such cities.

The mere statement of the scope of this amendment makes inevitable the conclusion that the changes it will work in this business will be material and fundamental.

When it was attempted to secure for telephone companies the government aid given by the Act of Congress

of 1866 to telegraph companies, the United States Supreme Court, through Harlan, Judge, used language applicable here: "It is not the functions of the judiciary, because of discoveries after the Act of 1866, to broaden the provisions of that Act so that it will include corporations or companies that were not, and could not have been at that time, within the contemplation of Congress." *Richmond* v. *Southern Bell Telephone Co.*, 174 U. S. 761, 776, 19 Sup. Ct. Rep. 778. Our statutes place electric power and electric light and power companies in a separate class with telephone and telegraph companies, and provide for governmental regulation. Thus the State regards the business as separate and apart from other businesses. Such a corporation is a quasi-public corporation and within the sphere of public service corporations. *Weld* v. *Gas & Electric Light Comrs.*, 197 Mass. 556, 557, 84 N. E. 101; note to *Jones* v. *North Georgia Elec. Co.*, 6 L. R. A. (N. S.) 122 (125 Ga. 618, 54 S. E. 85); 4 Cook on Corporations (6th Ed.) § 932.

That part of this company's business, to wit, the supplying water for power is a private business. The conversion of such a private business into a quasi-public business is a material and fundamental change in the character of that business. Almost universally the courts in analogous cases have held that a change in a charter so far-reaching as this could not be made against the will of a stockholder. The *Hartford & N. H. R. Co.* v. *Croswell*, 5 Hill (N. Y.) 384, 385, is a leading case, and the opinion by Chief Justice Nelson has been frequently cited and relied on. It denied to a railroad authorized to construct and operate a railroad between Hartford and New Haven, the right to operate under an amendment to its charter a steamboat line from New Haven to New York. *Carthage* v. *Carthage Light Co.*, 97 Mo. App. 20, 24, 70 S. W. 936; *Toledo* v. *Western Union Tel. Co.*, 107 Fed. Rep. 10, 14; *Omaha Electric L.*

& P. Co. v. *Omaha,* 172 Fed. Rep. 494, 497; *Richmond*
v. *Southern Bell Telephone Co.,* 174 U. S. 761, 773, 19
Sup. Ct. Rep. 778. I think these considerations show
that the amendment will change the scope of the busi-
ness of this company.

Let us now inquire whether this amendment will
change the business risk of the company. The author-
ities say a controlling reason why a subscriber to stock
cannot be held if the business venture is extended be-
yond that to which he subscribed, is that "it is not com-
petent for his coadventurers, even with the aid of the
legislature, to compel him to become a subscriber to
a different venture." 1 Commentaries on Corporations,
Thompson (1st Ed.) § 1286; *Fry's Exr.* v. *Lexington &*
*B. S. R. Co.,* 2 Met. (Ky.) 314, 321; *Durfee* v. *Old Colony*
*& F. R. R. Co.,* 5 Allen (Mass.) 230, 247.

Is it a new business venture to transform the private
business of supplying water-power into the business of
supplying electrical power, or electrical power and light
to the public? Will this not add greatly to the responsi-
bilities and duties of the company? Will it not involve
it in large expenditures? Will it not entail a new plant,
new machinery and new apparatus? Will it not require
new and skilled men to conduct this new manufacture?
Will it not require a reorganization of the business to
meet the new demands and duties? Will it not require
expert assistance from among those who are profession-
ally or practically acquainted with the electric power,
or the electric power and light business? Will it not
require the securing of many new customers in order to
pay the charges and operating expenses of the company
operating under the new amendment?

In place of a business compact and simple to conduct,
will there not be a business scattered over a large area,
and complex in the diversity of its business? Does not
this mean greatly increased fixed charges, operating

expenses and taxes? Is not the business risk greatly varied and largely increased?

Under the old business the water-power, so far as we know, was adequate. The industrial development of Windsor Locks in the last decade would seem to indicate this.

The amendment itself shows that the construction of the additional dam or dams, and canal or canals, is a part of the development of the new business. It grants the company authority to issue its bonds in the sum of $1,000,000, a huge sum for this company with its capital stock of $203,000. We know from the terms of the Act, the nature and necessities of the old business, and the character, extent and requirements of the new, that these bonds are to finance the conversion of this company into an electric power, light and heat company. I do not understand how it is possible to sustain the position that the business risk to the stockholder will not be materially increased if the company generates and sells electrical power, or electrical power and light. *Union Locks & Canals* v. *Towne*, 1 N. H. 44. Whether the change will benefit the stockholder or not, does not in the least affect his right to seek to restrain a material and fundamental change in the business of the company.

The court construes, as we have seen, the complaint to consist of acts involved in the construction of an electric power plant and electric transmission system and the sale in connection therewith of power. It says: "Should this corporation, therefore, make such constructions, build such a plant and install such a transmission system for the purpose of generating electrical energy from the latent water-power at its command and of transmitting it for useful application, and either itself use such energy for its own power purposes, or sell or deliver it to others for such use, and enter upon such course of action as a distinctive feature of its business

enterprise, it would not be making a fundamental or material change in the character, purposes or objects for which it was created." That is to say, this corporation under this amendment may, in the business of generating electricity from water-power, itself use the power so generated, or sell the same to others as authorized by this amendment anywhere in Hartford county, "and enter upon such course of action as a distinctive feature of its business enterprise."

I have construed the complaint to include not only power, but light, within its prohibition, but the argument for or against either is as effective as if for or against both. The court reaches its conclusion by holding that the same potential agency exists in "the direct application of the water in its fall to the old time water-wheel," as in the different methods of utilizing water-power which have resulted from later invention and discovery, among which methods is that of generating electricity. "In this," the court says, "there is only a change of method and the use of a different medium." Therefore the generation of electricity for use in its own business or for sale is not a material change in the character, purposes or objects of a corporation having the power to utilize water-power.

It is true the mechanical energy developed by water applied to the water-wheel direct or to the modern turbine is the same in kind. And the mechanical energy which revolves the shaft of the turbine revolves the shaft of the electrical generator because it is a part of it or attached to it. But there the similarity ends, and electricity has not been generated. By devices of man this mechanical energy is transformed into electrical energy through the medium of the generator with its armature revolving in its magnetic field. This, as we know, is the manufacture of a vendible commodity, which contains a like energy

with the mechanical energy of the water-power, but differs from it in the effects produced by it, in the method of controlling it, in the laws governing it, in its uses, and in the area in which it has the ability to do work.

Water-power, as such, could not be used away from the canal or industries whose machinery it operates. Its use is restricted to a few: that part of its business is of a private character; it cannot be sold to the public at large.

The generation of electricity for sale for power, or for power and light, is a public use, and the business a quasi-public business. The electricity generated may be divided into innumerable units, transmitted to great distances, and serve all the uses described in this amendment in furnishing power and light to any part of Hartford county.

The transmission of electricity, its storage, its measurement, its liberation, and its conversion into light, have all been accomplished by devices or apparatus designed each for a special purpose. Without these and many others, the business provided for by this amendment could not be conducted. The purpose of the present business of selling water-power is to supply mechanical energy to industries at or adjacent to Enfield Falls. Its character is local, its business private. The purpose of the new business is to convert this mechanical energy into electrical energy which may be transmitted and distributed anywhere in Hartford county by the instrumentality of mechanical devices and apparatus as a commodity of sale, and at the point of user again converted by machine or device into light, or by the purchaser into mechanical energy.

This is not merely a change in method and the use of a different medium, but the development of great businesses through the invention of man in conjunction

with his capital and labor, thus enlarging the scope of the business, adding to its responsibilities, multiplying its capacity for work and use, and increasing its risk. And in law this is a material and fundamental change in the business.

I have found only one other instance in which the ground of decision was discussed in the opinion of the court. The claim there was that water-power and electric power were one, but the court saw in them vital and characteristic marks of difference. *Minnesota C. & P. Co.* v. *Koochiching Co.*, 97 Minn. 429, 445, 451, 107 N. W. 405.

The argument of the opinion would have added the telephone to the powers of a telegraph company, an electric light to a gas company, and converted the horse railroad to the electric street-railway company, against the will of dissentient stockholders.

Much of what has been said in the course of this discussion applies to this point, and need not be repeated.

The court holds that the business of generating and selling electrical power under this amendment is one readily separable from other businesses within the purview of the Act, and those provisions of the amendment appropriate to the power-business may readily be disassociated from those which touch upon other matters. The court does not make this separation. I have endeavored to accomplish this and failed. Most of the instrumentalities provided are obviously for the generation of electricity, but what part of these, if any, are for boat navigation, what for power, what for light and what for heat, cannot on this record be told. What part of the issue of bonds shall be for one and what for the others we do not know.

If the court is right in its conclusion that the generation of electricity is a mere authorization of a new

method or medium for carrying out the original plan of developing and selling water-power, it would logically, and hence legally, follow, that the use ought to be confined to the existing uses, which are limited to the supplying of water-power at and adjacent to Enfield Falls, and hence the demurrer should have been overruled.

I have not attempted in this case to discuss the right of an individual or of the ordinary corporation, for their own uses, to generate electricity, but have dealt with the right of the Connecticut River Company, under the amendment of 1909, to engage in the public business of generating and selling electricity for power, or for power and light. I conclude by expressing my agreement with this statement: "There is a strong tendency in the decisions, and a tendency which is deserving of the highest commendation, to limit the power of the legislature to amend a charter under this reserved power. . . . Any attempt to use this power of amendment for the purpose of authorizing a majority of the stockholders to force upon the minority a material change in the enterprise, is contrary to law and the spirit of justice." Cook on Stock & Stockholders, § 501.

The case was one which ought in my opinion to have had a hearing on the facts: the court would then have had before it facts which would have been of great assistance in construing this charter and these amendments, and a body of technical and scientific facts which would have enabled it to have spoken with greater certitude.

For the reasons above stated I think there was error.